NO. 4-04-0460          Filed: 12/4/06

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| BOBBY L. JOHNSON | ) | No. 02CF1373 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Elizabeth A. Robb, |
| | ) | Judge Presiding. |

_____

JUSTICE STEIGMANN delivered the opinion of the court:

In March 2004, a jury convicted defendant, Bobby L. Johnson, of (1) two counts of attempt (first degree murder), in that defendant committed attempted murder of Lyle and Janice Knapp (720 ILCS 5/8-4, 9-1(a)(1) (West 2002)) and (2) home invasion (720 ILCS 5/12-11(a)(5) (West 2002)).  In April 2004, the trial court sentenced defendant to two concurrent 60-year terms in prison for attempt (first degree murder) and 85 years in prison for home invasion, which included a 25-year sentence enhancement imposed under section 12-11(c) of the Criminal Code of 1961 (720 ILCS 5/12-11(c) (West 2002)).  The court also ordered that defendant's 85-year prison sentence be served consecutively to the concurrent 60-year prison terms, as mandated by statute.

Defendant appeals, arguing that (1) the trial court erred by admitting other-crimes evidence; (2) the State failed to prove beyond a reasonable doubt that he committed the offense of attempt (first degree murder) involving Janice; (3) he cannot stand convicted of both home invasion and attempt (first degree murder)

of Lyle because to do so violates the one-act, one-crime rule; (4) his 85-year prison sentence for home invasion violates the proportionate-penalties clause; (5) his 145-year aggregate prison sentence is void; and (6) the court erred by ordering that his 85-year prison sentence be served consecutively to his 60-year concurrent prison terms. We disagree and affirm.

## I. BACKGROUND

In November 2002, the State charged defendant with (1) two counts of attempt (first degree murder) involving Janice (720 ILCS 5/8-4, 9-1(a)(1) (West 2002)), (2) two counts of attempt (first degree murder) involving Lyle (720 ILCS 5/8-4, 9-1(a)(1) (West 2002)), and (3) two counts of home invasion (720 ILCS 5/12-11(a)(5) (West 2002)).

In November 2003, the State filed amended motions in limine seeking to introduce evidence of (1) other shootings that occurred on the same day the Knapps were shot and were allegedly additional acts that defendant committed in retaliation for the death of Antonio Perry (who is referred to in the record as both defendant's cousin and his friend) and (2) the gang affiliation of defendant, Antonio, and others. Defendant later filed a motion in limine requesting that the trial court bar evidence of his gang affiliation and prior bad acts. Following a January 2004 hearing, the court granted the State's motions and denied defendant's, upon determining that the other-crimes evidence was "inextricably connected to the issues" of the case.

A. Evidence Regarding the Incident Involving the Knapps

- 2 -

At defendant's March 2004 trial, Janice testified that in November 2002, she and her husband, Lyle, lived in an apartment located at 339 Riley Drive in Bloomington. Around 8:30 p.m. on November 11, 2002, she was standing in the kitchen, while Lyle was in the bathroom. She heard her door loudly bang open, and a few seconds later, a black man with a gun appeared from around the corner and stood staring at her in surprise. He pointed the gun at Janice, and she curled into a fetal position against the kitchen wall. She was unsure whether the man had fired any shots toward her at this point. Lyle came out of the bathroom, the man pointed the gun at him, and Janice covered her eyes. Janice then heard two shots being fired. After a short pause, she heard two or three more shots and then heard the apartment door close. Janice stood up and tried to put pressure on her left ankle, but "it wouldn't work." She identified the State's exhibit No. 6 as being a photograph of her ankle wounds. Janice described the wounds as one "large open wound" on the outside of her ankle and a smaller cut on her ankle bone.

Janice also testified that immediately following the incident, she told the police that the assailant looked like Ty Johnson, who lived in the apartment located directly above the Knapps' apartment. She told the police that the assailant looked like Ty Johnson because both Ty Johnson and the assailant were black males who had cornrow braids in their hair. However, Janice denied that Ty Johnson was the man who fired the shots in their apartment. Janice acknowledged that she initially believed that

- 3 -

the assailant was about the same height as Lyle (5 feet 10 inches tall).  (Defendant was approximately 5 feet 3 inches tall.)

Lyle testified that around 8:30 p.m. on November 11, 2002, he was in the bathroom of their apartment when he heard a loud crash.  He came out of the bathroom and saw a black man crouched over Janice, with a silver pistol pointed toward her.  Lyle was not certain whether a shot had yet been fired.  The man then turned to face Lyle and pointed the gun at him.  Lyle ran toward the man and tried to hit him.  Before Lyle could reach him, the man shot Lyle in the forearm and Lyle fell to the floor.  As he was lying on the floor, the man shot him three more times (in his chest, abdomen, and armpit).  The man then left the apartment, and Lyle told Janice to call 9-1-1.

Both Janice and Lyle testified that two days later, on November 13, 2002, Bloomington police detective Matt Dick came to the hospital and separately showed each of them a photographic array of possible suspects.  They both identified the photograph of defendant as the man who broke into their apartment and fired shots.  Janice and Lyle also identified defendant in court as that same man.  Lyle testified that he had "no doubt whatsoever" that defendant was the man who burst into their apartment and fired shots.

Corey Cottrell testified that in November 2002, he lived in the same apartment building as the Knapps and on the same floor. Around 8:30 p.m. on November 11, 2002, he heard loud banging, and shortly thereafter, someone knocked on his apartment door.  When he

opened the door, a man approached him and asked where the building's exit was located. Cottrell gave the man directions, and as the man walked away, Cottrell noticed that he was holding a chrome pistol. On November 16, 2002, police showed Cottrell a photographic array of possible suspects, and he identified defendant as the man he saw on the night of the incident. Cottrell also identified defendant in court as that same man.

Dick, who was the lead detective investigating the incident, testified that Janice, Lyle, and Cottrell all identified defendant from a photographic array as the man involved. On cross-examination, Dick testified that it was his theory that the shootings of Janice and Lyle involved gang retaliation and the intended target was Ty Johnson, the Knapps' upstairs neighbor. According to Dick, Ty Johnson was targeted because he allegedly was involved in Antonio's murder.

Bloomington police detective Tommy Walters testified and identified the State's exhibit Nos. 35 and 36 as photographs depicting two handguns recovered during a November 14, 2002, search of the apartment of Kaywanda Childs, defendant's then-girlfriend. Exhibit No. 36 was a photograph depicting a .357 Magnum revolver, which was found in a paper bag that was stuffed between the cushions of a couch in Kaywanda's apartment. Walters also identified the State's exhibit No. 13 as the .357 magnum revolver. He further identified the State's exhibit No. 11 as a bullet that he found underneath the carpet in the Knapps' apartment and exhibit No. 12 as a bullet fragment recovered from Lyle during surgery.

(The parties stipulated that an Illinois State Police forensic scientist had determined that the .357 magnum fired both the bullet fragment recovered from Lyle and the bullet recovered from the Knapps' apartment.)

Defendant presented a defense based on an alibi--namely, that on the night of November 11, 2002, he was at the North Lee Street residence of Denise Perry, Antonio's mother--and mistaken identity.

### B. Evidence Regarding Other Crimes

Steven Roberts testified that on October 31, 2002, he, along with a male friend and two women, drove to a grocery store in Bloomington. After they parked, Roberts heard gunshots. He eventually got out of the car and saw Phil Harris, who was injured. Roberts tried to help Phil, who was his friend. While an ambulance took Phil to the hospital, Roberts stood outside the grocery store with Jackie Caldwell, Makwonda Johnson, and a man Roberts knew only as Ivan. Roberts learned that Antonio had been killed inside the grocery store. Roberts also saw defendant standing in the parking lot. Around 9 p.m. on November 11, 2002, someone fired gunshots into Roberts' residence. Roberts acknowledged that he did not see the person who fired the shots.

Aaron Harris, who lived on West Mulberry in Bloomington with his mother and brothers, Phil and Edward Harris, testified that Ty Johnson was his cousin. Around 5:45 p.m. on November 11, 2002, he heard gunshots in his mother's room. When he ran to her room, he saw shattered glass and bullet holes in the bathroom door.

(Walters processed the crime scene and found two partial bullets and one complete bullet inside the Harris residence. The parties stipulated that an Illinois State Police forensic scientist had determined that the .357 Magnum recovered from Kaywanda's apartment fired the bullet recovered from the Harris' residence.)

Amy Orris testified that she lived on Partner Place in Bloomington and Caldwell lived next door. Around 6:30 p.m. on November 11, 2002, Orris heard a "couple of pops." She looked out the front window and saw a black man standing in Caldwell's driveway shooting a gun.

Bloomington police detective Timothy McCoy testified that around 6:40 p.m. on November 11, 2002, he responded to a reported shooting. When he arrived at the scene, he found Khamandi Johnson, who informed McCoy that he had been shot in the stomach while sitting in his car on Partner Place. McCoy acknowledged that Khamandi did not know who shot him.

Bloomington police officer David Hoover testified that shortly after he heard the dispatch for the shooting on Partner Place, he drove his squad car to Denise's residence. While driving southbound on Lee Street, he saw five black males, including defendant (who matched the description of the suspect in the Partner Place shooting), walk to the front of Denise's residence. Hoover stopped the five individuals and ordered them to show their hands. After he determined that they did not have any weapons, he and other responding officers let them go.

As Hoover and the other officers prepared to leave, Phil

and Aaron drove by Denise's residence very slowly. Defendant pointed at Phil and said, "There is that motherfucker right there." Defendant then began running after Phil and Aaron's car. Hoover pulled his squad car in front of defendant, but defendant jumped across the hood of the car and continued chasing Phil. Aaron then pulled over, and Phil got out of the car and put his hands up in the air. When defendant kept running toward Phil, Hoover tackled defendant and put him in handcuffs. Hoover told Phil and Aaron to leave the area, which they did. Hoover then released defendant, upon determining that he was partially provoked by Phil and Aaron's actions.

Kevin Wilson testified that on November 14, 2002, he was at Kaywanda's apartment with defendant and Deion Hoskins. Wilson saw defendant put a brown paper bag containing a gun between the couch cushions where defendant was sitting. Wilson heard Hoskins and defendant "talking about some Phil nigger, how he [was] going to get his."

Dick testified that when he interviewed Wilson on November 14, 2002, Wilson told him that earlier that day while at Kaywanda's apartment, defendant told him not to sit on the couch, which had a brown paper bag stuffed in the cushions. Wilson also said that defendant talked about Phil, indicating defendant's "intentions on how he, you know[,] on how he gonna [sic] get killed."

Dick also testified that during a November 14, 2002, interview with Kaywanda, she stated that defendant always kept his

- 8 -

gun (which was gray with a brown handle) with him. Dick further testified on cross-examination that around 11:15 p.m. on November 11, 2002, Gabriel Van was shot. Dick acknowledged that no one identified defendant as the individual who shot Van.

The parties stipulated that Hoskins was arrested on November 14, 2002, and the next day, he spoke by telephone with Kaywanda and Leticia Childs. During part of the conversation that was recorded, Hoskins said that on November 14, 2002, defendant had the .357 Magnum on the couch in Kaywanda's apartment.

Based on the evidence, the jury convicted defendant of (1) attempt (first degree murder) of Lyle (720 ILCS 5/8-4, 9-1(a)(1) (West 2002)), (2) attempt (first degree murder) of Janice (720 ILCS 5/8-4, 9-1(a)(1) (West 2002)), and (3) home invasion (720 ILCS 5/12-11(a)(5) (West 2002)). In April 2004, the trial court sentenced him as earlier stated.

This appeal followed.

## II. ANALYSIS

### A. Other-Crimes Evidence

#### 1. Admissibility of Other-Crimes Evidence and the Standard of Review

In People v. Spyres, 359 Ill. App. 3d 1108, 1112, 835 N.E.2d 974, 977 (2005), this court discussed the admissibility of other-crimes evidence, as follows:

> "The term 'other-crimes evidence' encom-
> passes misconduct or criminal acts that oc-
> curred either before or after the allegedly
> criminal conduct for which the defendant is

- 9 -

standing trial. See People v. Illgen, 145 Ill. 2d 353, 365, 583 N.E.2d 515, 520 (1991); People v. Colin, 344 Ill. App. 3d 119, 126 n.2, 799 N.E.2d 451, 458 n.2 (2003); People v. Bobo, 278 Ill. App. 3d 130, 132, 662 N.E.2d 623, 625 (1996). Generally, other-crimes evidence is inadmissible if it is relevant only to demonstrate a defendant's propensity to engage in criminal activity. People v. Richee, 355 Ill. App. 3d 43, 50-51, 823 N.E.2d 142, 149 (2005). Such evidence may be admissible, however, when it is relevant to show motive, intent, identity, absence of mistake or accident, modus operandi, or the existence of a common plan or design. People v. Wilson, 214 Ill. 2d 127, 135-36, 824 N.E.2d 191, 196 (2005), People v. Hansen, 313 Ill. App. 3d 491, 500, 729 N.E.2d 934, 942 (2000). Indeed, other-crimes evidence is admissible to prove any material fact other than propensity that is relevant to the case. People v. Donoho, 204 Ill. 2d 159, 170, 788 N.E.2d 707, 714 (2003). However, even when relevant for a permissible purpose, the trial court may exclude other-crimes evidence 'if its prejudicial effect substantially outweighs its proba-

tive value.'  Illgen, 145 Ill. 2d at 365, 583

N.E.2d at 519."

Thus, other-crimes evidence is not generally admissible.  After the trial court determines that evidence constitutes other-crimes evidence, the court must then determine whether it comes within one of the exceptions to the general rule against such evidence.

This analysis is essentially the same as that which trial courts use--and are very familiar with--when addressing hearsay objections.  The rule is that hearsay is not generally admissible. So, when an objection is made to some evidence on the ground that it is hearsay, a court will first determine whether it is hearsay and, if so, whether it falls within one of the several hearsay exceptions.

The admissibility of other-crimes evidence lies in the trial court's sound discretion, and we will not disturb that court's decision absent a clear abuse of discretion.  Spyres, 359 Ill. App. 3d at 1113, 835 N.E.2d at 978.  "'An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.'"  People v. Sutherland, No. 99047, slip op. at 67 (September 21, 2006), ___ Ill. 2d ___, ___, ___ N.E.2d ___, ___, quoting People v. Hall, 195 Ill. 2d 1, 20, 743 N.E.2d 126, 138 (2000).

### 2. Forfeited Claim as to Some Other-Crimes Evidence

Initially, we note that defendant has forfeited his claim that the trial court erred by admitting evidence of the November

- 11 -

11, 2002, shooting of Van. As the State points out, it was defendant who elicited this evidence at trial, not the State. A party cannot complain of error that he himself injected into the trial. See In re Detention of Swope, 213 Ill. 2d 210, 217, 821 N.E.2d 283, 287 (2004) ("Simply stated, a party cannot complain of error which that party induced the court to make or to which that party consented").

3. The Trial Court's Admission of the Other-Crimes Evidence

Defendant argues that the trial court erred by admitting the following other-crimes evidence: (1) defendant's November 11, 2002, altercation with Phil; (2) the November 11, 2002, drive-by shooting of the Harris residence; (3) the November 11, 2002, drive-by shooting of Roberts' residence; and (4) the November 11, 2002, drive-by shooting of Khamandi. We disagree. For the following reasons, we conclude that the other-crimes evidence was admissible under multiple exceptions to the rule against other-crimes evidence, including (1) continuing narrative, (2) common scheme or design, (3) motive, (4) intent, and (5) identification. Further, each of these exceptions (as we discuss below) constitutes a separate and independent basis for the admission of the other-crimes evidence.

a. The Continuing-Narrative Exception
to the Rule Against Other-Crimes Evidence

This court has recognized that other-crimes evidence is admissible if it is part of a continuing narrative of the event that gave rise to the offense. People v. Thompson, 359 Ill. App.

- 12 -

3d 947, 951, 835 N.E.2d 933, 936 (2005). As we have explained, "'[w]hen facts concerning uncharged criminal conduct are all part of a continuing narrative which concerns the circumstances attending the entire transaction, they do not concern separate, distinct, and unconnected crimes.'" Thompson, 359 Ill. App. 3d at 951, 835 N.E.2d at 936, quoting People v. Collette, 217 Ill. App. 3d 465, 472, 577 N.E.2d 550, 555 (1991); see also People v. Carter, 362 Ill. App. 3d 1180, 1190, 841 N.E.2d 1052, 1060 (2005) (other-crimes evidence is admissible to explain an aspect of the crime charged that otherwise "would be implausible or perhaps even inexplicable").

Judged in accordance with the applicable case law, we conclude that the continuing-narrative exception applies here to the admission of the other-crimes evidence because, without that evidence, defendant's bursting into the apartment of the Knapps (who were total strangers) and shooting them for no apparent reason was inexplicable. We note that defendant argued that the Knapps were mistaken in their identification of him, and he also asserted an alibi defense. His inexplicable shooting of the Knapps (absent the other-crimes evidence) would bolster his theory of misidentification. Without the other-crimes evidence, the State would have been unable to provide any theory as to why defendant attacked the Knapps.

The altercation with Phil (who had shot and killed Antonio 11 days earlier) and the drive-by shootings, all of which occurred within hours of the Knapps' being shot--along with the

evidence that Ty Johnson, who lived directly above the Knapps, was defendant's intended target--furnished a back story that made the evidence of the charged crimes understandable.

### b. The Common Scheme or Design Exception to the Rule Against Other-Crimes Evidence

"Evidence of a common design proves the existence of a larger criminal scheme of which the crime charged is only one element." Spyres, 359 Ill. App. 3d at 1112, 835 N.E.2d at 977, citing People v. Jones, 156 Ill. 2d 225, 239, 620 N.E.2d 325, 330 (1993). As we discussed in Spyres, (1) "'the existence of factual similarities between multiple crimes does not, in itself, establish that the crimes were committed as part of a common design, scheme, or plan'" (Spyres, 359 Ill. App. 3d at 1113, 835 N.E.2d at 978, quoting Hansen 313 Ill. App. 3d at 503, 729 N.E.2d at 944); and (2) "'[i]n determining whether multiple crimes have been committed as part of a common design, scheme, or plan, [it is] far more sensible to focus on the defendant's state of mind or purpose in committing the offenses than on the factual similarities of the offenses'" (Spyres, 359 Ill. App. 3d at 1113, 835 N.E.2d at 978, quoting Hansen, 313 Ill. App. 3d at 505, 729 N.E.2d at 945).

In this case, the evidence showed that when defendant committed the other crimes (that is, the altercation with Phil, who murdered Antonio, and the drive-by shootings involving individuals who were somehow connected to Antonio's murder), defendant's purpose and state of mind centered around his plan to avenge Antonio's murder. Thus, the other-crimes evidence clearly supported the State's theory that (1) defendant was involved in a

- 14 -

larger, overall scheme or design to be a vigilante and avenge Antonio's murder and (2) the shooting of the Knapps was a part of defendant's larger scheme or design.

### c. The Motive Exception to the Rule Against Other-Crimes Evidence

Although the State is not required to prove motive, "it is certainly entitled to do so when evidence of motive exists." People v. Hale, 326 Ill. App. 3d 455, 466, 762 N.E.2d 59, 68 (2001). As earlier stated, proof of other crimes is admissible to establish motive. People v. Coleman, 158 Ill. 2d 319, 333, 633 N.E.2d 654, 662 (1994); Hale, 326 Ill. App. 3d at 465, 762 N.E.2d at 68.

In this case, the other-crimes evidence was relevant to show defendant's motive--that is, to engage in a vigilante mission and avenge Antonio's murder--when he burst into the Knapps' apartment and began shooting. Explaining to the jury why defendant attacked the Knapps was an important part of the State's case. The other-crimes evidence enabled the jury to understand the full story of what motivated defendant to break into the Knapps' apartment and shoot them.

### d. The Intent Exception to the Rule Against Other-Crimes Evidence

Evidence showing that an event was not caused by accident tends to show that it was caused intentionally. In addition, the requisite mental state may be inferred from the defendant's conduct and the circumstances surrounding his commission of the crime. People v. Blaney, 324 Ill. App. 3d 221, 224, 754 N.E.2d 405, 409

- 15 -

(2001).

In this case, specific intent to kill was an issue. See 720 ILCS 5/8-4, 9-1(a)(1) (West 2002); People v. Valentin, 347 Ill. App. 3d 946, 951, 808 N.E.2d 1056, 1061 (2004) (to achieve a successful prosecution for attempt (first degree murder), the State must prove beyond a reasonable doubt that the defendant, with the specific intent to kill, commits any act that constitutes a substantial step toward the commission of murder). The other-crimes evidence was relevant to show defendant's intent when he burst into the Knapps' apartment and began shooting. The jury could have inferred defendant's intent to kill the Knapps based on the drive-by shootings, in which defendant shot with the intent to kill as part of his vigilante mission.

### e. The Identification Exception to the Rule Against Other-Crimes Evidence

Other-crimes evidence is admissible when it is relevant to show identity or bolster a victim's identification of the perpetrator. Spyres, 359 Ill. App. 3d at 1112, 835 N.E.2d at 977; see People v. Jones, 328 Ill. App. 3d 233, 239, 764 N.E.2d 1232, 1237 (2002) (noting that other-crimes evidence is admissible to bolster the defendant's identification if identity is at issue); People v. Andrade, 279 Ill. App. 3d 292, 303, 664 N.E.2d 256, 264 (1996) (other-crimes evidence "may be admitted when it is relevant for some other purpose, such as identification").

As earlier stated, defendant contended that the Knapps had mistakenly identified him. In light of that contention, the other-crimes evidence was highly probative of, and admissible to

- 16 -

show, defendant's identity as the man who burst into the Knapps' apartment and shot them. That evidence also was admissible to bolster the Knapps' identification of defendant as their assailant.

### f. The Trial Court's Exercise of Its Discretion in Admitting the Other-Crimes Evidence

As earlier stated, the admissibility of other-crimes evidence lies in the trial court's sound discretion, and we will not disturb that court's decision absent a clear abuse of discretion. Spyres, 359 Ill. App. 3d at 1113, 835 N.E.2d at 978.

The trial court here was in the best position to (1) determine whether the other-crimes evidence came within any of the exceptions to the general rule against other-crimes evidence and (2) weigh the prejudicial impact of the other-crimes evidence in the context of the entire case. Reviewing the court's decision under the appropriate standard, we conclude that the court-- exercising its discretion--could have admitted the other-crimes evidence under any (or all) of the exceptions discussed above.

Because we have concluded that the trial court did not abuse its discretion by admitting the other-crimes evidence, we need not address defendant's claim that the prosecutor exacerbated the erroneous admission of that evidence by commenting "extensively" on it. Regardless, when viewed in its entirety, the prosecutor's closing argument did not unduly emphasize the other-crimes evidence.

### g. Rebuttal to Defendant's Evidence

We stress that even if the trial court had decided to not

admit the other-crimes evidence during the State's case in chief, that evidence would have been separately admissible in the State's rebuttal case to rebut defendant's alibi defense. Under those circumstances, the State clearly would have been entitled to rebut defendant's evidence with evidence that defendant was committing other crimes and the crimes against the Knapps as part of his vigilante mission.

### 4. Defendant's Claim That the Evidence That He Committed the Drive-By Shootings Was Speculative

Defendant next argues that the evidence that he committed the November 11, 2002, drive-by shootings was inadmissible because it "consisted only of mere speculation." We disagree.

The State need not prove beyond a reasonable doubt that the defendant committed an uncharged crime. However, the State's proof "must be more than a mere suspicion." People v. Thingvold, 145 Ill. 2d 441, 456, 584 N.E.2d 89, 95 (1991).

In this case, the evidence showed that all of the drive-by shootings occurred within hours of the shooting at the Knapps' apartment, which occurred around 8:30 p.m. on November 11, 2002. Shots were fired into the Harris residence around 5:45 p.m.; Khamandi was shot around 6:30 p.m.; and shots were fired into Roberts' residence around 9 p.m. In addition, (1) the same gun that was used in the Knapps' shooting (which was linked to defendant) was used in the drive-by shooting of the Harris residence, (2) defendant matched the description of the suspect in Khamandi's shooting, and (3) some of the drive-by shooting victims were connected to the October 31, 2002, murder of Antonio, which,

- 18 -

under the State's theory, was the reason for defendant's vigilante actions. In particular, Phil Harris was the person who actually shot and killed Antonio, while Roberts arrived at the scene immediately following the shooting and tried to help Phil, who had been injured. Roberts acknowledged that defendant also was at the scene immediately following the October 31, 2002, shooting. Further, the drive-by shootings were but a part of defendant's overall vigilante mission, which also included defendant's altercation with Phil. Taken together, this far exceeds the standard of being more than a mere suspicion that defendant committed or was involved in the commission of the November 11, 2002, drive-by shootings.

5. The Irrelevance of the Fact That Defendant Was Never Arrested or Charged with the Drive-By Shootings

Defendant next argues that the fact that he was not arrested or charged with the drive-by shootings somehow diminishes their value as other-crimes evidence. We disagree.

Whether defendant was ever arrested or charged for his conduct that constitutes other-crimes evidence is totally irrelevant to a determination of whether that evidence is admissible. See People v. Ash, 346 Ill. App. 3d 809, 816, 805 N.E.2d 649, 654 (2004) ("To hold that evidence of other crimes is more prejudicial than probative simply because the crimes are uncharged would be tantamount to barring all evidence of other crimes").

6. The Trial Court's Failure To Sua Sponte Instruct the Jury Regarding the Other-Crimes Evidence

Defendant next argues that even if the other-crimes

evidence was admissible, the trial court erred by failing to <u>sua</u> <u>sponte</u> instruct the jury regarding its proper use. We disagree.

Initially, we note that at the hearing on the parties' motions <u>in</u> <u>limine</u>, (1) defendant, through his counsel, informed the trial court that he would not request a limiting instruction at trial and (2) the court did not provide the jury with the pattern jury instruction on other-crimes evidence. See Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000) (hereinafter IPI Criminal 4th). Given defendant's acquiescence to the court's handling of the other-crimes evidence, his argument on appeal is forfeited and not reviewable except under the plain-error doctrine.

In <u>People v. Denny</u>, 241 Ill. App. 3d 345, 360-61, 608 N.E.2d 1313, 1324 (1993), this court stressed the importance of a contemporaneous jury instruction on the purpose of other-crimes evidence when it wrote, in pertinent part, as follows:

> "Because of the significant prejudice to a defendant's case that the admission of other[-]crimes evidence usually risks, we hold that trial courts should not only instruct the jury in accordance with IPI Criminal 2d No. 3.14 at the close of the case, but also orally from the bench (unless [the] defendant objects) at the time the evidence is first presented to the jury."

Nonetheless, we concluded in <u>Denny</u> that the trial court's failure to <u>sua</u> <u>sponte</u> give the pattern jury instruction did not constitute

plain error. Denny, 241 Ill. App. 3d at 360, 608 N.E.2d at 1323; see also People v. Hensley, 354 Ill. App. 3d 224, 233-34, 819 N.E.2d 1274, 1283 (2004) (reaffirming Denny and concluding that the plain-error doctrine did not require reversal); People v. Tolbert, 323 Ill. App. 3d 793, 800, 753 N.E.2d 1193, 1200 (2001) ("it is not always plain error for a court to fail to instruct the jury regarding the limited purpose for other-crimes evidence"). "[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." People v. Herron, 215 Ill. 2d 167, 186-87, 830 N.E.2d 467, 479 (2005).

Review of the record shows that the evidence was not closely balanced nor was defendant deprived of a fair trial by the trial court's failure to sua sponte instruct the jury on the proper use of the other-crimes evidence. We thus conclude that the court did not commit plain error by failing to sua sponte give IPI Criminal 4th No. 3.14 to the jury.

Although we have so concluded, we nonetheless reaffirm Denny and Hensley and urge trial courts to not only instruct the jury in accordance with IPI Criminal 4th No. 3.14 at the close of the case, but also orally from the bench when the other-crimes evidence is first presented to the jury (unless the defendant objects).

### 7. Defendant's Claim That His Trial Counsel Provided Ineffective Assistance

- 21 -

Defendant next argues that his trial counsel provided ineffective assistance of counsel when he failed to request a limiting instruction for the other-crimes evidence. We disagree.

Ineffective-assistance-of-counsel claims are reviewed under the standard set forth in Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). People v. Evans, 186 Ill. 2d 83, 93, 708 N.E.2d 1158, 1163 (1999). "To obtain reversal under Strickland, a defendant must prove (1) his counsel's performance failed to meet an objective standard of competence and (2) counsel's deficient performance resulted in prejudice to the defendant." Thompson, 359 Ill. App. 3d at 952, 835 N.E.2d at 937. To satisfy the deficient-performance prong, the defendant must show that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the sixth amendment (U.S. Const., amend. VI). To satisfy the prejudice prong, the defendant must show that but for counsel's errors, a reasonable probability exists that the outcome of the proceedings would have been different. Thompson, 359 Ill. App. 3d at 952, 835 N.E.2d at 937. The failure to satisfy either Strickland prong will preclude a finding of ineffective assistance of counsel. People v. Young, 347 Ill. App. 3d 909, 927, 807 N.E.2d 1125, 1140 (2004).

In this case, defendant has not shown that his trial counsel was not functioning as the "counsel" guaranteed by the sixth amendment when counsel failed to request a limiting instruction for the other-crimes evidence. Counsel may have made a tactical decision not to request such an instruction to avoid

unduly emphasizing the other-crimes evidence. Moreover, this court has held that a defendant cannot establish prejudice as to his counsel's failure to request a limiting instruction when--as here-- "'the other-crimes evidence is an integral part of the context of the crime for which defendant has been tried.'" Thompson, 359 Ill. App. 3d at 953, 835 N.E.2d at 937, quoting People v. Figueroa, 341 Ill. App. 3d 665, 672, 793 N.E.2d 712, 718 (2003).

### B. Sufficiency of the Evidence Regarding Attempt (First Degree Murder) of Janice

Defendant next argues that the State failed to prove beyond a reasonable doubt that he committed the offense of attempt (first degree murder) of Janice. Specifically, he contends that no evidence showed that he intended to kill Janice. We disagree.

As earlier stated, to achieve a successful prosecution for attempt (first degree murder), the State must prove beyond a reasonable doubt that the defendant, with the specific intent to kill, commits any act that constitutes a substantial step toward the commission of murder. 720 ILCS 5/8-4, 9-1(a)(1) (West 2002); Valentin, 347 Ill. App. 3d at 951, 808 N.E.2d at 1061. A defendant's intent is an issue of fact to be determined by the trier of fact. Intent can be inferred from the surrounding circumstances, including the character of the attack, use of a deadly weapon, and severity of the injury. Valentin, 347 Ill. App. 3d at 951, 808 N.E.2d at 1061.

In People v. Ward, 215 Ill. 2d 317, 322, 830 N.E.2d 556, 558-59 (2005), the Supreme Court of Illinois addressed a defendant's argument that the State's evidence was not sufficient to

sustain his conviction and wrote the following:

> "When reviewing the sufficiency of the evidence of a criminal conviction, it is not the function of [a reviewing] court to retry the defendant. [Citation.] The relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

The supreme court has also stated that "[u]nder this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." People v. Bush, 214 Ill. 2d 318, 326, 827 N.E.2d 455, 460 (2005). In addition, "[p]roof beyond a reasonable doubt does not require the exclusion of every possible doubt." People v. Standley, 359 Ill. App. 3d 1096, 1101, 835 N.E.2d 945, 950 (2005).

In this case, the evidence showed that (1) defendant burst into the Knapps' apartment and pointed a gun at Janice; (2) Janice curled against the kitchen wall in a fetal position; (3) when Lyle came out of the bathroom, he saw defendant crouched over Janice, pointing a gun in her direction; (4) Janice and Lyle were unsure whether defendant fired any shots prior to Lyle's coming out of the bathroom; (5) Janice, who then had her eyes covered, heard two shots, a pause, and two or three more shots; (6) Janice suffered a "large open wound" on the outside of her ankle and a

- 24 -

smaller cut on her ankle bone; (7) Janice identified defendant in court as the man who broke into the apartment, pointed a gun at her, and fired several shots inside the apartment; and (8) the attack on Janice and Lyle was part of defendant's overall scheme to shoot to kill during his vigilante mission.

Having carefully reviewed the evidence in the light most favorable to the State, we conclude that the evidence supports the guilty verdict. Based on the sum of the State's evidence, the jury reasonably could have (1) inferred defendant's intent to kill Janice from defendant's use of a deadly weapon, the character of the attack (including defendant's bursting into the apartment and pointing a gun at Janice as she was curled in a fetal position), and the circumstances surrounding the attack and (2) thus found that defendant committed the offense of attempt (first degree murder) of Janice.

C. One-Act, One-Crime Rule

Defendant next argues that he cannot stand convicted of both home invasion and attempt (first degree murder) of Lyle because to do so violates the one-act, one-crime rule set forth in People v. King, 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844-45 (1977). We disagree.

The one-act, one-crime doctrine prohibits multiple convictions when (1) the convictions are carved from precisely the same physical act or (2) one of the offenses is a lesser-included offense of the other. People v. Lindsey, 324 Ill. App. 3d 193, 200, 753 N.E.2d 1270, 1277 (2001). Thus, the first step is to

determine whether the defendant's conduct consisted of a single physical act or separate acts. People v. Harvey, 211 Ill. 2d 368, 389, 813 N.E.2d 181, 194 (2004). "Multiple convictions are improper if they are based on precisely the same physical act." People v. Rodriguez, 169 Ill. 2d 183, 186, 661 N.E.2d 305, 306 (1996). Our supreme court has defined an "act" as "'any overt or outward manifestation which will support a different offense.'" Rodriguez, 169 Ill. 2d at 188, 661 N.E.2d at 307, quoting King, 66 Ill. 2d at 566, 363 N.E.2d at 845. If the court determines that the defendant's convictions are based on multiple acts, the court will determine whether any of the offenses are lesser-included offenses. If they are, multiple convictions are improper. If none of the offenses are lesser-included offenses, then multiple convictions may stand. Harvey, 211 Ill. 2d at 389-90, 813 N.E.2d at 194-95. We consider this issue de novo. People v. Peacock, 359 Ill. App. 3d 326, 331, 833 N.E.2d 396, 400 (2005).

### 1. Defendant's Claim That His Convictions Were Based on the Same Physical Act

Defendant first contends that his conviction for attempt (first degree murder) was based on the same physical act (shooting Lyle) that formed the basis for his home-invasion conviction. We disagree.

In People v. Tate, 106 Ill. App. 3d 774, 778, 436 N.E.2d 272, 275 (1982), the defendant argued on appeal that his convictions for home invasion and aggravated battery had been "'carved' from the same act." This court disagreed, upon concluding that the knifing of the victim was the entire basis of the aggravated-

- 26 -

battery conviction but only part of the basis of the home-invasion conviction. We reasoned that "the entry by the assailant in[to] the *** home was a separate act which was an important and required part only of the home[-]invasion offense." Tate, 106 Ill. App. 3d at 778, 436 N.E.2d at 275.

In People v. Priest, 297 Ill. App. 3d 797, 802, 698 N.E.2d 223, 227 (1998), we concluded that convictions of home invasion and domestic battery were based upon interrelated acts rather than a single physical act. We explained that "[t]he fact that [the] defendant unlawfully entered [the] home [was] an overt or outward manifestation supporting the home[-]invasion conviction, a separate act from causing [the victim] bodily harm, [which] support[ed] the domestic[-]battery conviction." Priest, 297 Ill. App. 3d at 802, 698 N.E.2d at 227.

In Peacock, 359 Ill. App. 3d at 331-32, 833 N.E.2d at 400-02, this court reaffirmed both Tate and Priest and held that an offense, such as home invasion, can consist of more than one act. We concluded that as charged in that case, home invasion contained two elements--namely, (1) the unauthorized entry of a dwelling and (2) the intentional injury of a person therein. In so concluding, we reasoned that "[o]ne element is just as much a physical act as the other." Peacock, 359 Ill. App. 3d at 333, 833 N.E.2d at 402. We thus further concluded that the defendant's home-invasion and aggravated-battery convictions "were based on interrelated acts rather than 'precisely the same physical act.'" (Emphases in original.) Peacock, 359 Ill. App. 3d at 333, 833 N.E.2d at 402.

- 27 -

We adhere to the holdings and principles set forth in Peacock, Tate, and Priest. In this case, defendant was charged with attempt (first degree murder), which was based solely on the physical act of shooting Lyle. Defendant also was charged with home invasion, in that he knowingly, being a person who is not a peace officer acting in the line of duty, without authority entered the dwelling place of the Knapps, when he knew or had reason to know that one or more persons were present therein and personally discharged a firearm that proximately caused great bodily harm to Lyle, a person within the dwelling. 720 ILCS 5/12-11(a)(5) (West 2002). Thus, as charged in this case, home invasion was based on two physical acts--namely, (1) the unauthorized entry of a dwelling place and (2) the shooting of Lyle, resulting in great bodily injury. Defendant's unauthorized entry into the Knapps' dwelling was a separate physical act that was a required part only of the home-invasion offense. Accordingly, defendant's convictions for attempt (first degree murder) and home invasion were based on interrelated acts, not exactly the same physical act.

2. Defendant's Claim That Attempt (First Degree Murder)
Was a Lesser-Included Offense of Home Invasion

Defendant also contends that even if his attempt (first degree murder) conviction was not based on the same physical act that formed the basis for his home-invasion conviction, attempt (first degree murder) is a lesser-included offense of home invasion. We disagree.

In general, courts have taken two different approaches to identifying lesser-included offenses--the abstract-elements

- 28 -

approach and the charging-instrument approach. People v. Bowens, 307 Ill. App. 3d 484, 492, 718 N.E.2d 602, 609 (1999). Our supreme court has expressed its preference for the charging-instrument approach. See People v. Kolton, 219 Ill. 2d 353, 360-61, 848 N.E.2d 950, 954-55 (2006) (discussing People v. Novak, 163 Ill. 2d 93, 643 N.E.2d 762 (1994) (in which the supreme court adopted the charging-instrument approach)). "The charging[-]instrument approach looks to the allegations in the charging instrument to see whether the description of the greater offense contains a 'broad founda-tion' or 'main outline' of the lesser offense." Kolton, 219 Ill. 2d at 361, 848 N.E.2d at 954-55. Under the charging-instrument approach, the decision whether an offense is lesser included involves a case-by-case determination "using the factual descrip-tion of the charged offense in the indictment." Kolton, 219 Ill. 2d at 367, 848 N.E.2d at 958. "A lesser offense will be 'included' in the charged offense if the factual description of the charged offense describes, in a broad way, the conduct necessary for the commission of the lesser offense and any elements not explicitly set forth in the indictment can reasonably be inferred." Kolton, 219 Ill. 2d at 367, 848 N.E.2d at 958.

With these principles in mind, we review the statutory definition of attempt (first degree murder) and determine whether the facts alleged in the home-invasion charging instrument contain a broad foundation or main outline of the offense of attempt (first degree murder). As earlier stated, a person commits the offense of attempt (first degree murder) when he, with the specific intent to

- 29 -

kill, commits any act that constitutes a substantial step toward the commission of murder. 720 ILCS 5/8-4, 9-1(a)(1) (West 2002). As stated above, the charging instrument alleged that defendant committed the offense of home invasion in that he knowingly, being a person who is not a peace officer acting in the line of duty, without authority entered the dwelling place of the Knapps, when he knew or had reason to know that one or more persons were present therein and personally discharged a firearm that proximately caused great bodily harm to Lyle, a person within the dwelling. 720 ILCS 5/12-11(a)(5) (West 2002).

We conclude that the home-invasion charging instrument did not set forth a broad foundation or main outline of attempt (first degree murder). In particular, it did not explicitly allege that defendant had the specific intent to kill, which is an element of attempt (first degree murder). Nor can the specific-intent element be inferred from the allegation that defendant "personally discharged a firearm that proximately caused great bodily harm." That allegation could imply acts that do not involve the specific intent to kill. We thus conclude that the connection between the charging instrument's allegations and the elements of attempt (first degree murder) is simply too tenuous to identify attempt (first degree murder) as a lesser-included offense of home invasion. See generally People v. Baldwin, 199 Ill. 2d 1, 15-16, 764 N.E.2d 1126, 1134 (2002) (concluding that the connection between the home-invasion charging instrument and the elements of aggravated unlawful restraint were too remote to identify aggra-

vated unlawful restraint as a lesser-included offense of home invasion).

D. Proportionate-Penalties Clause

Defendant next argues that the offense of home invasion (involving great bodily harm caused by the discharge of a firearm) (720 ILCS 5/12-11(a)(5) (West 2002)) violates the proportionate-penalties clause when compared to the offense of armed violence predicated on trespass to a residence and involving great bodily harm caused by the discharge of a firearm (720 ILCS 5/33A-2(c), 33A-3(b-10), 19-4(a)(2), (b) (West 2002)). Specifically, he contends that the two offenses are identical but have different sentences. We disagree.

In evaluating statutory challenges brought under the proportionate-penalties clause, our supreme court had--until its decision in People v. Sharpe, 216 Ill. 2d 481, 517-18, 839 N.E.2d 492, 514-15 (2005)--employed three distinct tests: (1) whether the penalty is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community; (2) whether the described offense, when compared to a similar offense, carries a more severe penalty although the proscribed conduct creates a less serious threat to the public health or safety (cross-comparison test); or (3) whether the described offense, when compared to an offense having identical elements, carries a different sentence. People v. Huddleston, 212 Ill. 2d 107, 130, 816 N.E.2d 322, 335-36 (2004). However, in Sharpe, 216 Ill. 2d at 517, 839 N.E.2d at 514, the supreme court held that a defendant may

no longer challenge a penalty under the cross-comparison test--that is, a defendant may no longer challenge a penalty under the proportionate-penalties clause by comparing it with the penalty for an offense with different elements.  The Sharpe court retained the other two types of proportionate-penalties challenges, including the identical-elements test defendant raises here.  Sharpe, 216 Ill. 2d at 517, 839 N.E.2d at 514; see also People v. McCarty, Nos. 100469, 100813, slip op. at 19 (October 19, 2006), ___ Ill. 2d ___, ___, ___ N.E.2d ___, ___ (discussing Sharpe).

The home-invasion statute provides, in pertinent part, as follows:

> "(a) A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present or he or she knowingly enters the dwelling place of another and remains in such dwelling place until he or she knows or has reason to know that one or more persons is present and
>
> * * *
>
> (5) Personally discharges a firearm that proximately causes great bodily harm, permanent disability, permanent disfigurement, or

death to another person within such

dwelling place."  720 ILCS

5/12-11(a)(5) (West 2002).

The offense of home invasion involving great bodily harm caused by the discharge of a firearm is a Class X felony (see 730 ILCS 5/5-8-1(a)(3) (West 2002) (except as otherwise provided for in the statute defining the offense, a Class X felony carries a penalty of 6 to 30 years in prison)), for which 25 years or up to a term of natural life in prison shall be added to the term of imprisonment imposed by the trial court (720 ILCS 5/12-11(c) (West 2002)). Thus, the offense carries an enhanced penalty of 31 years to natural life in prison.

The armed-violence statute provides as follows:

"(c) A person commits armed violence when he or she personally discharges a firearm that is a Category I or Category II weapon that proximately causes great bodily harm, perma-nent disability, or permanent disfigurement or death to another person while committing any felony defined by Illinois law, except first degree murder, attempted first degree murder, intentional homicide of an unborn child, predatory criminal sexual assault of a child, aggravated criminal sexual assault, aggravated kidnaping, aggravated battery of a child, home invasion, armed robbery, or aggravated vehicu-

- 33 -

lar hijacking."   720 ILCS 5/33A-2(c)  (West 2002).

Criminal trespass to a residence is defined, in pertinent part, as follows:

> "A person commits the offense of criminal trespass to a residence when, without author-ity, he or she knowingly enters the residence of another and knows or has reason to know that one or more persons is present or he or she knowingly enters the residence of another and remains in the residence after he or she knows or has reason to know that one or more persons is present."   720 ILCS 5/19-4(a)(2) (West 2002).

The offense of armed violence predicated on trespass to a residence and involving great bodily harm caused by the discharge of a firearm (720 ILCS 5/33A-2(c), 33A-3(b-10), 19-4(a)(2), (b) (West 2002)) is a Class X felony that carries a penalty of 25 to 40 years.  720 ILCS 5/33A-3(b-10) (West 2002).

Two clear differences exist between the two offenses--the offense of armed violence predicated on trespass to a residence and involving great bodily harm caused by the discharge of a firearm does not contain <u>any</u> requirement that (1) the offender be an individual "who is not a peace officer acting in the line of duty" or (2) the victim who suffered great bodily harm was within the "dwelling place" that the offender entered.   Thus, because the

offenses of home invasion (involving great bodily harm caused by the discharge of a firearm) and armed violence predicated on trespass to a residence and involving great bodily harm caused by the discharge of a firearm--as defined by our legislature--are not identical, we conclude that the identical-elements test was not violated. We thus further conclude that defendant's 85-year sentence is not unconstitutional under the proportionate-penalties clause.

E. Defendant's Aggregate Prison Sentence

Defendant next argues that his 145-year aggregate prison sentence is void. We disagree.

Section 5-8-4(c)(2) of the Unified Code of Corrections (Unified Code) provides, in pertinent part, as follows:

"[T]he aggregate of consecutive sentences for offenses that were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective shall not exceed the sum of the maximum terms authorized under [s]ection 5-8-2 for the [two] most serious felonies involved ***." 730 ILCS 5/5-8-4(c)(2) (West 2002).

In this case, defendant was convicted of three Class X felonies. Section 5-8-2 of the Unified Code provides that a Class X felony is punishable by a prison term ranging from 30 to 60 years. 730 ILCS 5/5-8-2(a)(2) (West 2002). Defendant thus contends that under

section 5-8-4(c)(2) of the Unified Code (730 ILCS 5/5-8-4(c)(2) (West 2002)), the maximum aggregate prison sentence was 120 years.

However, as the State points out, in 2000, the legislature enacted Public Act 91-404 (Pub. Act 91-404, §10, eff. January 1, 2000 (1999 Ill. Laws 5126, 5130-31)), which amended the sentencing provisions of several different felony offenses-- including home invasion--to provide for an additional mandatory prison term when a firearm is involved in the commission of the crime. The degree of the sentencing enhancement depends upon the degree to which the firearm was involved in the commission of the felony. Sharpe, 216 Ill. 2d at 485, 839 N.E.2d at 496.

Thus, the home-invasion statute, as amended by Public Act 91-404, provides that the following penalties "shall be added" to whatever sentence the trial court imposes: (1) a 15-year sentence enhancement for committing the offense while armed with a firearm, (2) a 20-year sentence enhancement for personally discharging a firearm during the commission of the offense, and (3) a sentence of 25 years to natural life for personally discharging a firearm that proximately causes great bodily harm, permanent disability, permanent disfigurement, or death to another person during the commission of the offense. 720 ILCS 5/12-11(c) (West 2002).

When construing a statute, we must give effect to the legislature's intent. Calibraro v. Board of Trustees of Buffalo Grove Firefighters' Pension Fund, 367 Ill. App. 3d 259, 262, 854 N.E.2d 787, 790 (2006). "[I]n determining the legislature's intent, the court may properly consider not only the language of

the statute, but also the reason and necessity for the law, the evils sought to be remedied, and the purpose to be achieved." People v. Culbreath, 343 Ill. App. 3d 998, 1010, 798 N.E.2d 1268, 1277 (2003). In addition, when two statutes conflict, the more recent enactment takes precedence over the earlier enactment. Calibraro, 367 Ill. App. 3d at 262, 854 N.E.2d at 790.

In People v. Dixon, 359 Ill. App. 3d 938, 943, 835 N.E.2d 925, 929-30 (2005), this court discussed Public Act 91-404 and wrote as follows:

"Our supreme court has determined the purpose of Public Act 91-404 (Pub. Act 91-404, eff. January 1, 2000 (1999 Ill. Laws 5126)) is '"to deter the use of firearms in the commission of felonies."' [People v. Moss, 206 Ill. 2d 503, 525, 795 N.E.2d 208, 222 (2003)], quoting People v. Walden, 199 Ill. 2d 392, 396, 769 N.E.2d 928, 931 (2002). It has also recognized that gun violence presents a pervasive and enhanced danger."

Our supreme court also has held that Public Act 91-404's "amendments add a mandatory additional term of years to whatever sentence would otherwise be imposed." (Emphases added.) Sharpe, 216 Ill. 2d at 484-85, 839 N.E.2d at 496.

In addition, as earlier noted, Public Act 91-404, which amended the home-invasion statute to include the firearm enhancement (720 ILCS 5/12-11(c) (West 2002)), was enacted in 2000.

- 37 -

Section 5-8-4(c)(2) of the Unified Code (730 ILCS 5/5-8-4(c)(2) (West 2002)), on the other hand, was originally enacted in 1973 (Ill. Rev. Stat. 1973, ch. 38, par. 1005-8-4(c); Pub. Act 77-2097, eff. January 1, 1973 (1972 Ill. Laws 758, 830)) and was most recently amended in 1997 (Pub. Act 90-128, §5, eff. July 22, 1997 (1997 Ill. Laws 2424, 2424)).

Given (1) that the legislature clearly intended that the mandatory firearm enhancement penalty be <u>added</u> to "whatever sentence would otherwise be imposed" (<u>Sharpe</u>, 216 Ill. 2d at 485, 839 N.E.2d at 496), (2) that the home-invasion statute's firearm enhancement provision was the more recent statute, and (3) the evil sought to be remedied and the purpose to be achieved by the firearm-enhancement, we conclude that the home-invasion statute's firearm-enhancement provision takes precedence over section 5-8-4(c)(2) of the Unified Code.

### F. Consecutive Sentencing

Last, defendant argues that the trial court erred by ordering his 85-year prison sentence for home invasion be served consecutively to his 60-year concurrent terms for attempt (first degree murder). Specifically, he contends that the court failed to articulate the basis for its determination that consecutive sentences were statutorily mandated. We disagree.

Although the trial court indicated only that the consecutive sentences were statutorily mandated, the court ordered that the sentences run consecutively under section 5-8-4(a)(i) of the Unified Code. That section provides that the trial court shall

impose consecutive sentences when "one of the offenses for which defendant was convicted was *** a Class X or Class 1 felony and the defendant inflicted severe bodily injury." 730 ILCS 5/5-8-4(a)(i) (West 2002). "'[A]ny Class X or Class 1 felony that results in severe bodily injury being inflicted on the victim of that felony triggers consecutive sentences.'" (Emphasis in original.) People v. Phelps, 211 Ill. 2d 1, 16, 809 N.E.2d 1214, 1222 (2004), quoting People v. Whitney, 188 Ill. 2d 91, 99, 720 N.E.2d 225, 229 (1999). Nothing in section 5-8-4(a)(i) of the Unified Code requires that the trial court set forth in the record its finding that the defendant inflicted severe bodily injury on the victim.

In this case, defendant was convicted of home invasion, which is a Class X felony. Lyle testified that after bursting into the Knapps' apartment, defendant shot him four times--in the forearm, armpit, abdomen, and chest. In addition, the presentence investigation report indicated that Lyle was hospitalized for 16 days as a result of the gunshot wounds. During his long hospitalization, Lyle underwent several medical procedures and surgeries, including repair of his left radial artery, repair of gastric perforations, the open reduction and internal fixation of radial and ulnar fractures, and skin grafting. The record clearly shows that Lyle's injuries constituted "severe bodily injury" for the purpose of consecutive sentencing under section 5-8-4(a)(i) of the Unified Code.

In so concluding, we commend the trial court for imposing a prison sentence that, in the trial court's own words, "will

insure that [defendant] will not ever be a free person to engage in acts of violence against any other persons."  Defendant's crimes were heinous--bursting into an unsuspecting couple's home, shooting its residents, and leaving one of them severely injured.  We agree with the court that anyone who commits such a terrible crime forfeits his right ever again to walk among free citizens in a free society.  Only by putting defendant behind bars for a lengthy period of time could the court ensure that no other couple would suffer the modern urban nightmare that the Knapps endured.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.  As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal.

Affirmed.

APPLETON and MYERSCOUGH, JJ., concur.