THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEVE HALE, Defendant-Appellant.

Fifth District   No. 5—99—0700

Opinion filed December 14, 2001.

Daniel M. Kirwan and Rita K. Peterson, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Brian T. Shinkle, State's Attorney, of Albion (Norbert J. Goetten, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KUEHN delivered the opinion of the court:

The evidence presented in this case told the chilling tale of an April Fools' Day killing spree that began in parts of rural Indiana and ended in the darkness of a cemetery on the outskirts of Albion, Illinois. When Steve Hale and Chalk Wessell, a deadly duo, failed in their effort to make David Chalcraft their fifth murder victim of the day, Chalcraft was able to alert the authorities, focus an ongoing search, and enable the police to hunt them down.

The State was spared the task of bringing Wessell to justice. As the search party closed in, they heard a series of gunshots. When they found Wessell, he had a bullet lodged in his brain. Three misfortunate souls in Indiana, and one in Illinois, expired from the same condition that day.

Steve Hale faced a capital murder prosecution. This is the story that unfolded during the course of his trial.

The day was April 1, 1998. Hale and Wessell were in western Indi-

ana when David Chalcraft left his Albion, Illinois, farmhouse and drove the country mile to where his parents lived. David shared an evening meal with his mom and dad. It might easily have been their last supper together.

While David enjoyed his mother's home cooking, Hale and Wessell enjoyed a mix of methamphetamine and cocaine. Their drug-induced pleasure had no conscience. They roamed the Indiana territory just east of the Wabash River, leaving a trail of human remains in their wake.

David completed his evening visit and prepared to return home. But as he exited the front door, an old friend passed by. Larry Sams decided to stop and share a few moments with his old buddy. It proved to be a fatal decision.

The spring foliage on the trees had not yet filled to a point that prevented David from seeing his own house from his parents' front porch. As he and Larry stood there chatting, David noticed a mysterious green car enter his driveway. Its occupants seemed to be inspecting David's home, his barn, and the surrounding grounds. David decided to investigate. He asked Larry if he would mind coming along to lend support. Larry gladly obliged. The two companions got into David's pickup truck and drove off to confront the two silhouettes in the green car that continued to troll the grounds next to David's house.

The green Chevrolet Camaro in David's driveway was the property of Pam Cook. But she was not in it. About the same time that David had started to dine with his folks, Pam had attended to a knock at her front door. When she greeted the stranger standing outside, he answered with the barrel of a pistol and a demand for her Camaro. After she readily surrendered her keys, she received an unkind bullet to the brain. Pam had died on her front porch a few hours earlier.

David and Larry were about to meet her killers, who were looking to trade one stolen vehicle for another.

Pam Cook was the third Indiana resident to have the misfortune of running into Hale and Wessell that day. Jeremiah Miller and Marlin Knepp each had their brief encounter with them. They, too, died from gunshot wounds to the head.

About 7 p.m. that same evening, while Indiana authorities continued to discover dead bodies, Hale and Wessell crossed the Wabash River into Illinois. They pulled into a Casey's General Store in Albion, Illinois. Wessell aroused the manager's suspicion by purchasing such sundry items as duct tape, leather gloves, a pair of pliers, and a set of screwdrivers. Thinking that Wessell was up to no good, the manager instructed a coworker to get the license number of the green

Camaro resting on the parking lot. Wessell saw what was happening. He threw a large amount of money onto the counter, told the cashier to keep the change, and rushed out of the store and into the car. He drove away in a hasty fashion.

The encounter was reported to the Albion police, who traced the car to the reported murder of Pam Cook in Indiana. Illinois State Police officers were summoned to the Albion area, where a massive manhunt got under way.

Hale and Wessell, worried that the store manager would report their license number to the police, decided to ditch Pam Cook's Camaro. They drove into the countryside in search of a different vehicle. Their search led them up David Chalcraft's driveway. Having discovered that Chalcraft's farm offered no vehicle to steal, Hale and Wessell decided to leave. As they drove down the long and narrow driveway, intent on finding another ride elsewhere, their search for another vehicle ended. David and Larry arrived in David's pickup truck.

The pickup and Camaro converged to a stop, five feet apart and squarely facing each other. There was nowhere for either vehicle to go. The two vehicles met at a point where the driveway rested atop a steep embankment, effectively blocking both vehicles from further movement.

Hale and Wessell had precisely what they wanted, a vehicle to replace the one that law enforcement officers would now be looking for. Their method of vehicular hijacking spelled imminent danger for David and Larry.

It was dark. David left his truck running and his headlights on as he exited his pickup. The Camaro's headlights were off, enabling David to see the two occupants inside. David approached the driver, intent on finding out his purpose for being there. He was about to find out, without inquiry. Wessell sat in the driver's seat armed and ready for the kill. The driver's door opened.

As David leaned forward to ask Hale and Wessell about their presence on his farm, Wessell thrust his weapon in the direction of David's head. David flinched from what he thought was an effort to hit him. Wessell shot him at point-blank range. Because of his reaction, David was spared a bullet to the head. The bullet passed through his neck instead. Fortunately, Wessell, now experienced at the effect of point-blank head shots, did not know that he had missed his target. Moreover, his attention immediately turned to Larry Sams.

As David spun to the ground, he saw Larry in front of the pickup. He saw Hale standing in front of Larry. David started to fall down the embankment. The last thing that he saw was Hale shooting his old friend "almost right between the eyes."

David laid motionless at the bottom of the bank. Wessell decided to ensure David's fate, firing another shot at him. As the bullet slammed into the ground next to David, he had the presence of mind to remain still. Immediately thereafter, he could hear Hale and Wessell walking toward Larry. He heard a barrage of gunfire from two different weapons. What David heard was Hale and Wessell planting a host of bullets into Larry's body.[1] David could hear Larry gasping for air. Larry's lungs were filling with blood from a chest wound. David continued to listen as an old friend took his dying breath.

Next, David heard either Hale or Wessell get into the Camaro and back it up in the direction of the house. The other assailant got into the pickup. The truck was driven toward David's house as well. David seized the opportunity to find Larry. When he realized that Larry was beyond help, he stayed in the darkness and circled through a field to his barn, where he kept a loaded shotgun. When he got to the barn, he saw that his truck was sitting empty, with the right door ajar. The Camaro was again moving slowly down the lane in the area that David had just vacated. Hale and Wessell were attempting to assure themselves of his demise. David armed himself and got into his truck. The Camaro was backing up in his direction. Shotgun in hand, he started the pickup and drove toward Hale and Wessell for a second encounter. Hale and Wessell might have stayed, finished off David, and obtained a replacement vehicle. However, David Chalcraft's survival and grit, along with the barrel of a shotgun hanging out of the window, must have unnerved them. Rather than engage in a duel in order to retake the pickup, Hale and Wessell ran. Apparently, they had no stomach for gunplay unless their prey was helpless and unarmed.

David did not give chase. He drove to his parents' house and called the sheriff. He spent the next two days in the hospital.

After David's report, the authorities closed in quickly. Spearheaded by a helicopter with a searchlight, the police mounted a full-scale search of the area. They located the Camaro, abandoned several miles away in a cemetery. Officers on the ground heard a series of gunshots. They found Wessell dead, with a gun held in each hand. The gun in Wessell's right hand fired a bullet later removed from his head. The police found Hale in short order. He was unarmed and appeared to be in a state of bewilderment. He was asked, but could not answer, how Wessell had died.

The aforementioned was the story that the State's evidence told. In this case, we must decide whether it was fair for the State to tell all

---

[1] The pathologist noted a straight-on wound to the eye, five wounds to the left side of the head, one wound to the front chest, and one wound to the back.

of its particulars. The jury heard Hale's tape-recorded statement, which included his version of those crimes committed in Indiana, as well as the crimes for which he stood trial.

A death-qualified jury heard the evidence presented and found Hale guilty of first-degree murder, aggravated battery with a firearm, armed violence, attempted murder, and aggravated vehicular hijacking. A sentencing hearing ensued. The jury found, beyond a reasonable doubt, that Larry Sams' murder qualified Hale for the death penalty. The State had proved to the jury's satisfaction that the death occurred during an aggravated vehicular hijacking. Thereafter, the jury considered evidence in aggravation and mitigation and voted to spare Hale's life. The determination of appropriate punishment passed to Judge Gamber. He found that the murder of Larry Sams was accompanied by brutal and heinous behavior indicative of wanton cruelty, and based upon that finding, he sentenced Hale to spend the rest of his life in prison. Judge Gamber tacked on 30-year consecutive prison terms as further punishment for each of Hale's other crimes. By so doing, he ensured that Hale could neither satisfy the punishment imposed nor expiate his misdeeds, at least not in this lifetime.

■ On appeal, the State agrees that Hale's convictions for aggravated battery with a firearm and armed violence are based upon the same act that underlies his attempted murder conviction, and it agrees that those convictions must therefore be vacated. Hale asks us to overturn all of his convictions and grant a new trial. Alternatively, he challenges the constitutionality of his life sentence.

The primary question raised on appeal takes aim at the trial court's decision to allow the submission of other-crimes evidence to the jury. Judge Gamber permitted the State to introduce to the jury evidence of the car theft in Indiana, the three murders committed in that State, and the circumstances of Chalk Wessell's death. Hale maintains that this evidence of criminality, extraneous to the charged conduct, infected his trial with a prejudice that compels the reversal of his convictions.

Here is his argument.

The jury should never have heard the portion of Hale's tape-recorded statement that detailed Hale's claim of how Wessell shot Pam Cook in order to steal her Camaro. This claim of how and why another murder occurred lacked sufficient probative value to outweigh its prejudicial effect. In addition, the jury should not have heard those portions of Hale's recorded statement that blamed Wessell for Jeremiah Miller's death and explained how that murder led to the drive-by killing of Marlin Knepp. Hale's statements, about how Miller died and why that led to Knepp's untimely death, added nothing to

the State's case. However, evidence of these two murders clearly conveyed the message that the Hale-Wessell twosome possessed a penchant for senseless bloodshed. Finally, the State should not have suggested to the jury that Wessell may well have been another murder victim, with a head wound that was not self-inflicted. These various references to other crimes committed on April 1, 1998, clearly prejudiced the chance of acquittal. They painted a portrait of a man willing to accompany, countenance, assist in, and engage in a killing rampage.

Hale was only on trial for the crimes alleged to have occurred in Illinois. The evidence should have been confined to proof related to those allegations. The jury should have decided guilt or innocence based upon evidence offered to establish what happened on David Chalcraft's driveway, without hearing evidence that established the accused's cold-blooded bent for murder.

Hale concludes his argument by quoting case law: "[A] defendant, no matter how reprehensible his crime or how black his history of past misdeeds, is entitled to have his guilt or innocence determined solely with reference to the crime with which he is charged." *People v. Gregory*, 22 Ill. 2d 601, 603, 177 N.E.2d 120, 122 (1961). He argues that he was deprived of this right when Judge Gamber allowed the State to introduce evidence of other criminality that occurred in Indiana. The evidence of murders committed earlier in the day, and the suggestion of Wessell's murder, harbored a prejudice that far outweighed its probative value. Its prejudicial effect was compounded by the fact that proof of the other crimes was totally unnecessary in order for the State to establish Hale's guilt for the murder of Larry Sams. The evidence of what happened in Illinois, without the proof of crimes committed in Indiana, was sufficient to establish Hale's direct participation in, and accountability for, Sams' death.

We certainly agree with the contention that the State had enough evidence to convict Hale without proving the commission of three Indiana murders, the theft of an Indiana motor vehicle, and the circumstances of Wessell's death. We also agree that the admission of such evidence diminished Hale's chances of acquittal, however slim those chances might have been. Notwithstanding, the State was entitled to introduce Hale's tape-recorded statement, a statement that detailed Hale's version of how and why all of the crimes, including those committed in Indiana, occurred. The evidence of other crimes was integral to the State's case, made necessary to sound decision-making by virtue of the defense that Hale tendered. Knowledge of the circumstances surrounding the earlier crimes allowed the jury to properly weigh Hale's claim that he was a blameless follower, acting out of fear and a

desire for self-preservation. It also allowed the jury to better understand why Hale and Wessell went to such lengths and were so intent to ensure that Chalcraft and Sams did not survive their encounter.

■ It is well settled that proof of other crimes, unrelated to those alleged in the charging instrument, cannot be introduced merely to show a propensity for criminal wrongdoing. *People v. Lindgren*, 79 Ill. 2d 129, 137, 402 N.E.2d 238, 242 (1980). If the State has no other legitimate reason for proving extraneous criminality, we will not countenance the use of such proof. *People v. Bobo*, 278 Ill. App. 3d 130, 132, 662 N.E.2d 623, 625 (1996). Even where the State has good reason to introduce other-crimes evidence, we acknowledge that an inference of criminal propensity will necessarily accompany its use and will require the trial judge to weigh the probative value of such evidence against its potential for producing an improper prejudicial effect, before deciding whether to allow for its admission. *People v. Heard*, 187 Ill. 2d 36, 58, 718 N.E.2d 58, 71 (1999).

The determination of whether other-crimes evidence should be admitted is within the sound discretion of the trial judge and will not be disturbed by us in the absence of an abuse of that discretion. *Heard*, 187 Ill. 2d at 58, 718 N.E.2d at 71.

The State possessed overwhelming evidence of guilt. David Chalcraft's survival provided a credible eyewitness to Hale's criminality. It also led to Hale's prompt arrest, moments after the crimes were committed. He was arrested a short distance from an abandoned car that Chalcraft identified. His dead associate held two murder weapons, linked to Larry Sams' death through ballistics testing. The manager of the Casey's General Store placed Hale in Pam Cook's car shortly before the murder. Finally, Hale provided his tape-recorded account of the crimes.

The evidence stacked against Hale was practically insurmountable. Yet the State's case, not unlike most cases, lacked perfection. Defense counsel was able to utilize portions of Hale's statements to authorities, coupled with Hale's bewildered demeanor when arrested, to fashion an argument that Wessell was solely to blame for all of the criminality. The defense blamed Wessell and attempted to raise doubt about Hale's legal responsibility for Wessell's conduct.

There was one significant dispute in the evidence. Although Chalcraft proved credible in his account of what happened, there was a question raised over whether he really saw Hale shoot Larry Sams "almost right between the eyes" before he fell down the embankment. Although he testified that he did, his initial statements to the authorities did not mention that fact. The defense questioned the absence of

this information from Chalcraft's original statements and suggested that Wessell, rather than Hale, fired the initial head shot that killed Larry Sams, a suggestion consistent with Hale's tape-recorded claim.

Defense counsel attempted to exploit the only possible weakness in the State's case. She did not have much to work with. The defense was not a very compelling one in light of several facts that were virtually beyond dispute. Hale and Wessell were trying to ditch one stolen motor vehicle and commandeer another, in order to continue the day's journey in an undetected fashion. When they found that vehicle and the deadly encounter ensued, Hale shot Larry Sams. His admission that he did so was neither challenged nor denied. The only question raised by the defense was whether Hale willingly fired the first shot into Sams' head, according to Chalcraft's claim, or whether he fired a reluctant second of several shots, according to Hale's tape-recorded statement. Finally, once Hale and Wessell believed Chalcraft and Sams to be mortally wounded, Hale continued to assist in the effort to exchange vehicles and in the patrol of Chalcraft's driveway to ensure that Chalcraft was dead.

In sum, there was a very good case of Hale's accountability for Wessell's acts, even if the jury had disregarded Chalcraft's testimony that he saw Hale fire the initial shot into Larry Sams' head. Hale would contend that this is precisely why the other-crimes evidence should have been excised from the case. The State had so little need for it in light of the other evidence that the State possessed. Hence, its probative value was slight while its potential for undue prejudice was great.

█ Hale thinks that the probative value of a piece of evidence is measured by how much other evidence exists to establish guilt. In weighing the probative value of other-crimes evidence against its potential for prejudice, the inquiry does not turn upon the relative strength or weakness of the State's case in its absence. The admissibility of other-crimes evidence is determined by whether it serves a legitimate purpose in the search for truth, even though an inevitable by-product of its admission is a showing of criminal propensity. In this case, Hale exploited a small weakness in the State's evidence, in an effort to raise doubt in some juror's mind about his complicity in Wessell's conduct. The State possessed highly probative evidence that could foreclose that possibility and remove all doubt about Hale's guilt. The probative value of the other-crimes evidence to the question placed at issue—Hale's accountability for the acts Wessell committed in Illinois—was compelling. Under such a circumstance, it was within the trial judge's discretion to admit it, even though the State's other evidence may well have carried the day without it.

A part of the State's case was Hale's tape-recorded statement. While it assisted the State in several ways, it also provided the basis for the defense. Hale's recorded statement blamed Wessell for everything that happened that day. He conveyed a subservient and reluctant role in the crimes, motivated out of a fear for his own safety rather than a genuine desire to assist in the killings. Hale also claimed that Wessell fired the first shot that led to Larry Sams' death.

Given Hale's efforts to exculpate himself, the other-crimes evidence became relevant to the decision-making process in ways other than its capacity to demonstrate Hale's propensity for committing murder.

Initially, we need to address Hale's complaint about the State's suggestion during the trial that Hale murdered Wessell. The State did not charge Hale with Wessell's murder. In addition, the circumstances surrounding the discovery of Wessell's body were ambiguous. It seemed entirely possible that Wessell chose suicide in lieu of capture. Hence, Hale argues that it was error for the State to suggest that he had murdered Wessell. He maintains that the suggestion was improper for two reasons: first, it interjected highly prejudicial other-crimes evidence into the case and, more importantly, it was based upon pure conjecture and lacked any probative value.

■ We think it within the bounds of propriety for the State to have suggested that Hale may have murdered Wessell. There is no reason to preclude the State from establishing how suspects are apprehended. The State had every right to tell the jury about the manhunt and its results. This included the circumstances surrounding the discovery of Wessell's body. When those circumstances are examined, it was not unreasonable for the State to point out that Hale may well have done in his cohort in crime and made it appear to be a suicide.

The State did not argue that Hale may have murdered Wessell merely to demonstrate a penchant for killing. The possibility of Wessell's murder placed Hale's exculpatory statements, and the defense derived from those statements, into better perspective. After all, Hale's effort to shed responsibility for Sams' death was contradicted by Chalcraft, and Wessell's death made it impossible for anyone to contradict Hale's claims about his role in the day's criminality.

The following facts allowed the State to argue, and the jury to reasonably infer, that Wessell had not committed suicide. As the search party closed in on Hale and Wessell, it heard a series of gunshots. Normally, someone intent on suicide does not fire a parade of bullets in order to effect death. Nor does he use two guns. Moreover, when a suicide bullet enters the brain, it is usually accompanied by a loss of muscular control over the suicide weapon. Here, Wessell took a large-

caliber bullet to the head at close range without losing a firm grip on two large pistols, one held in each hand. One of those pistols was the weapon Hale had used against Sams a short time earlier. It was in Hale's possession when the gunplay on Chalcraft's driveway began. Hale offered no explanation of how a weapon that he used throughout the day ended up in Wessell's possession. Based upon these peculiar circumstances, all inconsistent with the notion of suicide, we think that it was fair for the jury to consider the possibility that Wessell's death was a murder made to look like a suicide.

The suggestion that Hale shot Wessell was clearly offered for a legitimate purpose. The reasonable inference that he shot his cohort was necessary and relevant to discount Hale's defense. It belied Hale's claim of a relationship subservient to Wessell throughout their murderous trek across Indiana and Illinois.

The fact that the State had evidence to establish accountability without evidence of the three Indiana murders and the car theft did not preclude the State from using proof of those other crimes to cement the picture of Hale's ongoing countenance and aid in a continuous course of criminal conduct. Proof of the other murders and the car theft was essential to a proper understanding of why Hale's efforts to deny fault should be rejected. It blocked Hale's ability to argue that he was unaware of what was about to happen when Chalcraft approached Wessell. Hale's effort to create doubt about his role and motive in the crimes committed on Chalcraft's driveway was certainly prejudiced by the evidence of his participation in the earlier crimes. However, that prejudice flowed from how the earlier crimes conveyed an accurate picture of Hale's prior knowledge of Wessell, which enhanced the inference that he knowingly and willingly joined Wessell in producing Larry Sams' death and in the effort to hijack Chalcraft's pickup truck. The purpose of all evidence offered by the prosecution is to prejudice the accused's chances of acquittal. While the other-crimes evidence demonstrated a penchant for killing and stealing, it had the kind of probative value necessary to outweigh that side effect. It had a legitimate purpose necessary to the State's case. It provided significant evidence to refute the tendered claim of innocence and to dispel the suggestion that Hale joined in the gunplay only out of shock and fear for his own safety.

Finally, proof of other crimes is admissible to establish motive. *People v. Coleman*, 158 Ill. 2d 319, 333, 633 N.E.2d 654, 662 (1994). Here, each murder contained the motive for a murder that ensued, and the evidence of the other murders enabled the jury to understand the full nature and extent of what motivated the shooting of Chalcraft and Sams. Again, the information came from Hale's tape-recorded

statement. The statement constituted his claim of how and why the series of deaths occurred.

According to Hale, Wessell's murder of Jeremiah Miller was pointless. However, it made the killing of Marlin Knepp necessary. According to Hale, Wessell insisted that Hale needed to kill someone else in order to become an equal partner in crime. Hence, Marlin Knepp, an Amish farmer, riding an old tractor, was randomly targeted for death. The motive was Wessell's need for a criminal cohort that he could trust. Hale shot Knepp in the head as Wessell drove by the tractor. According to Hale, Wessell feared that an observer who drove by as the shooting occurred would report their car to the police. Wessell felt that they needed to abandon their car in order to avoid arrest. The need for new transportation provided the reason Wessell shot and killed Pam Cook.

A full understanding of the motive behind the crimes committed against David Chalcraft and Larry Sams required proof of what happened leading up to those crimes. David and Larry were not marked for death because of the motor vehicle they were in or the desire of Hale and Wessell to possess it. The real motive was more complex than a mere desire to hijack a pickup truck.

A fresh ride was a necessary ingredient in the effort of Hale and Wessell to avoid arrest, prosecution, and punishment for a series of unimaginable crimes. Given the exposure to punishment that already existed in the event of arrest and prosecution, Hale and Wessell had significant reason to obtain another vehicle and leave no eyewitnesses to report the hijacking. The real motive behind the murder of Larry Sams and the attempted murder of David Chalcraft was continued freedom. The other murders and the car hijacking placed the relentless effort to kill David and Larry into clear perspective. The jury was entitled to know that Hale and Wessell needed the pickup in order to continue their deadly journey in an undetected fashion. It was also entitled to know that Chalcraft and Sams were shot because Hale and Wessell wanted to ensure that the trail of death left behind in Indiana would never lead to them.

■ Hale argues that the State is not required to prove motive (*People v. Fickett*, 204 Ill. App. 3d 220, 232, 562 N.E.2d 238, 245 (1990)) and that other-crimes evidence is prohibited from use when motive is not in issue (*People v. Davis*, 248 Ill. App. 3d 886, 892, 617 N.E.2d 1381, 1386 (1993)). While the State is not required to prove motive, it is certainly entitled to do so when evidence of motive exists. The fact that the motive evolves from an ongoing crime spree does not require its removal from the process of decision-making. Here, motive was not only relevant to a proper understanding of the reasons behind Larry

Sams' death, but it was also essential to a proper measure of Hale's complicity in that death. To the extent that Hale argues that motive was not in dispute, he fails to understand what the true motive was. The fact that Hale and Wessell wanted to commandeer a motor vehicle was not in dispute. However, as previously noted, the murder of Larry Sams had a much stronger motive behind it—a motive that developed over the course of the day's criminality. Proof of what truly motivated the crimes committed on Chalcraft's driveway was an important facet of the State's case. That motive was directly linked to other crimes and made proof of those crimes admissible.

■ For the foregoing reasons, we conclude that Judge Gamber did not abuse his discretion in allowing the State to tell the full story of what happened on April 1, 1998. The Indiana murders and car theft and the circumstances of Wessell's death were a necessary part of the State's case, properly admitted to prove things other than Hale's propensity for criminal wrongdoing.

## Constitutionality of Sentence

■ The defendant challenges the constitutionality of his sentence. We are asked to examine the statutory sentencing scheme employed in this case, in light of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), a case in which the United States Supreme Court held a New Jersey hate-crime statute unconstitutional because it commissioned judges to make a factual finding that enhanced their power to punish beyond the maximum penalties prescribed for New Jersey criminal offenses.

The challenge is premised upon the fact that, in arriving at the life sentence that he imposed, Judge Gamber employed the statutory finding that this murder was accompanied by brutal behavior indicative of wanton cruelty. It is argued that this finding empowered him to impose a sentence in excess of a 60-year prison term, the maximum sentence the law allowed in the absence of the finding. See *People v. Nitz*, 319 Ill. App. 3d 949, 964, 747 N.E.2d 38, 50-51 (2001).

This was a capital case where the jury determined, beyond a reasonable doubt, that an aggravating factor existed and qualified the defendant's crime for a death sentence. Such a finding also raised the maximum penalty to which Hale was exposed, in the event that capital punishment was not imposed. See 720 ILCS 5/9—1(b) (West 1998). Under this circumstance, "[t]he trial court's subsequent finding that the murder 'was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty' did nothing to increase the penalty that defendant was facing." *People v. Ford*, 198 Ill. 2d 68, 74 (2001). Since the life sentence was established as the maximum

sentence in lieu of death, by those facts heard and decided by a jury, the sentence was imposed in accordance with the procedural safeguards that accompany a jury trial. Simply put, the jury decided, beyond a reasonable doubt, those facts that determined the maximum sentence the law would allow. See *Nitz*, 319 Ill. App. 3d at 969, 747 N.E.2d at 54. Therefore, there was no constitutional violation in the imposition of Hale's life sentence.

Judge Gamber's finding in arriving at the sentence that he deemed fit and proper for this defendant is of no consequence. We can affirm the trial judge's judgment on any grounds warranted by the record, regardless of the trial judge's stated reasons for the ruling. See *People v. Lee*, 325 Ill. App. 3d 643, 660 (2001).

For the foregoing reasons, we affirm Steve Hale's convictions for first-degree murder, aggravated vehicular hijacking, and attempted murder, we vacate his convictions for aggravated battery with a firearm and armed violence, and we affirm his sentence to natural-life imprisonment for the crime of first-degree murder.

Affirmed as modified.

MAAG, P.J., and WELCH, J., concur.