NOTICE
Decision filed 07/27/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220125-U

NO. 5-22-0125

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 19-CF-4053 |
| | ) | |
| BRADY K. WITCHER, | ) | Honorable |
| | ) | Kyle A. Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Justices Welch and Vaughan concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court did not abuse its discretion in admitting other-crimes evidence where its probative value outweighed its prejudicial effect and where the defendant was not subjected to a mini-trial on the uncharged offenses.

¶ 2   A jury convicted the defendant, Brady Witcher, of three counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2020)) and one count of armed robbery (*id.* § 18-2(a)(4)) in the shooting deaths of three people in Bethalto, Illinois. In a posttrial motion, the defendant asserted, *inter alia*, that it was error for the trial court to allow other-crimes evidence to be presented at trial. Following the denial of the defendant's posttrial motion, the trial court sentenced the defendant to three concurrent natural life terms for the murders, and a consecutive sentence of 30 years plus natural life for the armed robbery. This timely appeal followed. For the following reasons, we affirm.

1

¶ 3                      I. BACKGROUND

¶ 4      The defendant and codefendant, Brittany McMillan, were tried separately. On September 30, 2021, the State filed a motion to admit prior bad acts seeking to introduce evidence about other crimes allegedly committed by the defendant in Alabama and Tennessee before coming to Illinois and committing three murders. The State sought to introduce evidence that police officers in Alabama had received a report of a kidnapping of Jessica Graves and the homicide of Kellie Hughes that occurred in Alabama on December 13, 2019. The expected testimony would be that Graves was a friend of McMillan. McMillan contacted Graves and Hughes to offer them jobs in a criminal enterprise dealing in fraud and narcotics. The defendant was the leader in this enterprise. Graves reported to the Alabama police how Hughes was tortured and eventually murdered by the defendant and McMillan. Graves led the police to the body of Hughes in a wooded area. Graves stated that McMillan was in possession of a small, black gun throughout their time together. Graves described the defendant as having a larger, black gun with a silver slide. At the murder scene, the Alabama police recovered two .45-caliber shell casings. The expected testimony would also state that after witnessing the murder of Hughes, Graves was tortured and held captive by the defendant and McMillan until she was able to escape and contact the police on December 13, 2019.

¶ 5      The State also sought to introduce evidence from an incident in Tennessee five days later wherein the defendant and McMillan entered the residence of Diego and Taolima Padron, pointed guns at them, tied them up, placed them in a closet overnight, and stole their possessions and their vehicle before attempting to slash Diego's throat. After the Padrons escaped, the codefendants fled in the Padrons' vehicle. Later, a .45-caliber spent shell casing and .380-caliber spent shell casings were recovered in the Padrons' apartment. The State argued that the other-crimes evidence from

2

Alabama and Tennessee were admissible to prove motive, intent, identity, continuing narrative, and common scheme or design.

¶ 6    The trial court denied in part and granted in part the State's motion over the defendant's objection. The trial court did not allow the State to present evidence regarding the existence of a criminal enterprise. Regarding the torture and murder of Hughes in Alabama, the trial court found that the prejudicial effect outweighed the probative value and, therefore, did not allow the State to present this evidence to the jury. The trial court ruled that Graves's testimony would be limited to the following: that she knew the defendant and codefendant; that she had seen the codefendant with a small, black gun and the defendant with a larger black gun with a silver slide; and that she could identify the gun that was located in the hotel room at the time of the defendant's arrest. The trial court reserved its ruling on whether Graves would be allowed to testify that she was tortured and put into a closet. The trial court cautioned defense counsel that if he opened the door during cross-examination to other-crimes evidence that had been excluded, it might be allowed in.

¶ 7    As to the remainder of the evidence from Alabama, the trial court found it to be relevant, more probative than prejudicial, and necessary to allow the jury to understand the context of the events that occurred in Illinois. As to the other-crimes evidence from Tennessee, the trial court allowed the State to present all of it, finding, in pertinent part:

> "I'm letting in the entire Tennessee incident. I believe that that all comes in, because it is—and I find for all the reasons that the State has alleged. I think it goes to identification. It goes to motive. It goes to the common scheme that's going on with them fleeing from Tennessee and trying to get away and why they need a different car. It ties up the gun to both incidents.
>
> I think identity is an issue here. I think why three people in Bethalto were killed execution style is motive. While not needed to explain, it certainly is something that goes to it and what happened in Tennessee now brings it home to them coming to Bethalto. There was a connection to the family in Bethalto and why they're there."

3

¶ 8    On January 7, 2022, the defendant filed a motion *in limine* seeking to introduce evidence that two months prior to the murders in Illinois, McMillan had convinced a friend to rent a vehicle that was not returned and was later reported as stolen. The defendant alleged that his codefendant's "theft of the rented vehicle" was relevant to show her propensity to steal a car. The trial court denied the defendant's motion.

¶ 9    The evidence adduced at trial revealed that Shari Yates lived in Bethalto, Illinois, with her son Andrew Brooks. Amber Higgins was Yates's daughter. Higgins testified that she met the codefendant Brittany McMillan when McMillan stayed at her mother's home in Bethalto, Illinois, for approximately three weeks in October 2019. Higgins talked to her mother daily, but the last time Yates texted her daughter was on December 19, 2019, at 9:16 a.m.

¶ 10    At trial, Jessica Graves was allowed to testify that she was tortured by the defendant and McMillan. Prior to her testimony, the trial court gave a limiting instruction to the jury that the evidence that the defendant had been involved in offenses or conduct other than those charged in the indictment was to be received only on the issues of the defendant's intent, motive, or knowledge. After staying with Yates in Illinois, McMillan went back to Birmingham, Alabama. Graves testified at trial that in November and December of 2019, she lived with McMillan in Alabama. Graves had been friends with McMillan for 2½ years. While living with McMillan, Graves met the defendant in November 2019. The defendant was McMillan's boyfriend, and the three of them were living together by the later part of 2019.

¶ 11    On December 13, 2019, while Graves was living with the codefendants, they got upset with her. The defendant physically assaulted Graves, zip tied her, and hit her with a gun. McMillan tried to cut off Graves's finger with a pair of pliers while the defendant stood with a gun pointed at

4

Graves. The defendant had a black handgun with a silver top. McMillan held a gun to Graves's face and put a gun in her mouth.

¶ 12     When Graves's finger started bleeding badly, the codefendants zip tied her hands together and duct taped a garbage bag over her hands. The defendant then "hog tied" her and pushed Graves into a closet. McMillan stood watching, armed with a smaller, all-black gun. Once Graves was inside the closet, the defendant pistol-whipped her face with his gun and tied her up with her hands zip tied behind her back. McMillan handed the defendant a rag soaked in bleach which he placed in Graves's mouth before he put duct tape around her head so the rag would not come out. McMillan retrieved a deflated air mattress which the defendant used to wrap around Graves and zip tied her inside of it before leaving her in the closet.

¶ 13     At some point Graves heard the defendant and McMillan leave the apartment. She managed to free herself from the zip ties wrapped around the mattress. The bleach had loosened the duct tape so that Graves was able to remove it from her mouth. Graves was able to free a few of her fingers and dial 911. Graves managed to get out of the apartment as the police were arriving. At trial, Graves testified that the defendant used a black handgun with a silver top when he pistol-whipped her face, and she identified the defendant's handgun from a photograph depicted in a State's exhibit.

¶ 14     At trial, Diego Padron and his wife, Taolima Padron, testified to the events that occurred in Tennessee. On December 18, 2019, five days after Graves was injured in Alabama, Diego Padron and his wife Taolima arrived home from work to their Clarksville, Tennessee, apartment. While they were lying in bed, Diego saw a shadow around the bedroom door. When Diego stood up to investigate, he saw a man and woman standing at his bedroom door, each with a gun pointed at him. The two intruders told them, "Be quiet, get back, get down," and the Padrons complied.

The intruders used wires from electronics in the house to tie the Padrons' hands behind their backs. Diego testified that the intruders "hog tied" Taolima. At trial, Diego identified the defendant as the man who entered their apartment and stabbed him. He identified McMillan from a photo lineup as the woman who entered his home at gunpoint.

¶ 15    When they heard the sound of helicopters going overhead, the defendant and McMillan told the Padrons to be quiet and began blocking the windows with pillows. They then put the Padrons in a bedroom closet. The intruders took the Padrons' phones, wallets, and the keys to their 2012 white GMC Sierra truck. The defendant took some AR15 magazines. The codefendants asked the Padrons for cash. They did not have cash but instead gave the defendant and McMillan their bank cards and passwords. During the 10 to 12 hours they were confined, the Padrons were able to loosen their ties.

¶ 16    Early the next morning, on December 19, 2019, the defendant came to get Diego from the closet. He told Diego that he was going to gag him, cover his eyes, take him to the bathroom, and then he and McMillan were going to leave. The defendant cut one of the zip ties from around Diego's hands. Once in the bathroom, the defendant told Diego to kneel, put his head to the ground, and count to 100. When Diego hesitantly put his head down, the defendant hit his skull and back multiple times before stabbing Diego 10 to 12 times with a knife from the Padrons' kitchen. The defendant attempted to slice Diego's throat, but instead slashed his cheek. As the defendant was walking away, Diego was able to untie his hands. When the defendant heard Diego, he came back into the bathroom, took a knife, and stabbed Diego in the wrist. He then pulled out a gun and pointed it at Diego. When the defendant turned to speak to McMillan, Diego grabbed for the defendant's wrist. The defendant shot once, and Diego "bum rushed" him to the floor. Diego yelled to his wife that the intruders were going to kill them.

6

¶ 17    From the closet, Taolima heard gagging sounds from Diego, Diego yelling, and a gunshot. Taolima could see McMillan through the slightly opened closet door. While McMillan watched the struggle between Diego and the defendant, Taolima began hitting McMillan with a computer adapter. Taolima was able to wrestle the gun from McMillan. She aimed it at McMillan and pulled the trigger, but nothing happened. Taolima was able to make her way to the front door and run out of the apartment to get help. At trial, Taolima identified the defendant as the man who entered her apartment with a gun.

¶ 18    In the meantime, Diego continued to fight with the defendant and was able to put his thumb in the defendant's eye. At that point, Diego was able to get out of the apartment. When the paramedics and the police arrived, Diego reported to the police that as he was running away from the apartment, he saw the defendant and McMillan unlocking his truck. He told the police he owned a 2012 GMC Sierra truck. Diego was taken to the hospital for treatment of his injuries.

¶ 19    After being released from the hospital, Diego and Taolima discovered many of their belongings were missing from their apartment, including: a charger for power tools, his gym bag, his hygiene bag, his military documents, their identification cards and driver's licenses, her passport, their bedding, clothing, shoes, gloves, his wallet, their military backpacks, and coin jar filled with coins and cash. At trial, the Padrons identified photographs of their apartment after the defendant and McMillan had been there; photographs of their GMC Sierra truck and keys; and photographs of their missing personal property that was later found in the defendant's possession.

¶ 20    The trial court gave the limiting instruction to the jury between the testimony of the Padrons that the evidence of offenses or conduct other than those charged in the indictment were to be received only on the issues of the defendant's intent, motive, or knowledge.

¶ 21    Using cell phone data from the defendant's phone obtained pursuant to a search warrant, the police were able to track the defendant's various locations on December 19, 2019, using GPS coordinates. The GPS coordinates established that the defendant was in the area of Clarksville, Tennessee, at 5:04 a.m. After leaving the Clarksville area, the GPS coordinates revealed that the defendant traveled north to Illinois where a call was placed from the defendant's phone from an area north of Benton, Illinois, at 7:55 a.m.; St. Clair County, Illinois, at 8:48 a.m.; and Bethalto, Illinois, at 9:57 a.m. The GPS coordinates also established that the defendant's cell phone was in downtown St. Louis, Missouri, at 11:12 a.m.

¶ 22    Video surveillance footage from a gas station in Ina, Illinois, revealed the defendant and McMillan pulled up to a gas pump in a white truck at 7:44 a.m. on December 19, 2019. Analysis of the defendant's iPhone 7 showed that someone had entered the destination address of 300 South Walnut, Bethalto, Illinois, from the location of the gas station on December 19, 2019. The destination address was within 600 feet from the Yates residence on Mills Street in Bethalto.

¶ 23    A neighbor living next door to the Yates residence had surveillance cameras on his house pointing towards the street. Video surveillance footage revealed that on December 19, 2019, a white truck matching the description of Diego's GMC Sierra truck was traveling westbound on Mills Street at approximately 9:39 a.m., and then two minutes later, the truck was headed westbound towards the Yates residence.

¶ 24    On December 19, 2019, at approximately 4:49 p.m. the defendant and McMillan arrived at a motel in Hazelwood, Missouri, less than an hour from Bethalto, Illinois. Parking lot video surveillance at the motel revealed that after checking in, McMillan removed some bags from the trunk, and the defendant removed a backpack from the vehicle before entering the motel room with

McMillan. The codefendants left the room for a period of time. Nobody exited or entered the room again until the SWAT team arrived.

¶ 25    On December 19, 2019, the Bethalto police were contacted by a federal agent who was investigating a home invasion and stolen vehicle out of Tennessee. The federal agency had tracked the two suspects by their cell phones to a motel in Hazelwood, Missouri. Detective Matthew Zufall was part of the FBI's Violent Crime Safe Streets Task Force. The detective immediately responded to the motel and maintained surveillance of the area. Around 10 p.m., the task force took the codefendants into custody without incident.

¶ 26    Upon viewing parking lot surveillance video, Detective Zufall determined that the codefendants arrived at the motel in a blue Ford Fusion with a Wisconsin license plate on the back. Inside the Ford Fusion, investigators later found the original Illinois license plate. After running the Illinois plate, the detective learned that the car was registered to Shari Yates, a resident of Bethalto, Illinois. Because Yates was not located at the motel, Detective Zufall contacted the Bethalto Police Department to request a welfare check on Yates.

¶ 27    Bethalto police sergeant Jack Wofford received the welfare check request on December 19, 2019, at 11 p.m. Detective Zufall requested that during the welfare check, Sergeant Wofford inquire as to how Yates's vehicle came to be in the possession of the defendant. When the sergeant knocked on the door at the Yates residence, no one answered, and there were no vehicles in the driveway. However, he noticed some lights on in the residence and looked in the windows. When Sergeant Wofford saw a damaged interior door lying on the floor and a pale-looking white male with some blood on his face on the couch, he called for emergency assistance. When backup arrived, the officers entered the residence through the side door.

9

¶ 28    In the living room, the deceased male on the couch was identified as John McMillian. There was one live and one spent .45-caliber shell casing found on the floor. When Sergeant Wofford lifted the interior door from the floor, he found a second deceased subject later identified as Andrew Brooks, Yates's son. There were no shell casings or ammunition found near his body. The sergeant found a deceased female identified as Yates on the floor in a bedroom. Sergeant Wofford exited and secured the residence.

¶ 29    On December 20, 2019, Illinois State Police crime scene investigators processed the Yates residence for evidence. There were no signs of forced entry. There was no evidence that any of the residents owned a gun. In addition to the shell casings found by Sergeant Wofford, a fourth discharged .45-caliber cartridge was found on the floor under the nightstand to the right of the bed in the bedroom where Yates was found.

¶ 30    After the police left, when Higgins was cleaning her mother's home, she found mail belonging to McMillan in the kitchen. She contacted police about the mail and reported a bullet hole she had found in the bedroom floor. Police responded to the call and recovered the projectile from the southwest bedroom floor.

¶ 31    At the motel room in Hazelwood, Missouri, where the defendant and McMillan were found, evidence was photographed and collected. Among the items discovered by detectives in the motel room was a black and silver .45-caliber Springfield Armory XDS loaded handgun with a red substance on the end of the barrel and two magazines with rounds of .45-caliber ammunition. Following testing, a forensic scientist opined that the three bullets recovered during the autopsies of the three Illinois victims were fired from the Springfield Armory gun. The forensic scientist further opined that a later-submitted projectile from the Bethalto crime scene and a shell casing from the Tennessee crime scene were both fired from the Springfield Armory gun which was

10

recovered from the motel room where the defendant was found. DNA evidence revealed that it was Diego Padron's blood that was on the barrel of the handgun found with the defendant at the hotel.

¶ 32 On the nightstand next to the handgun, detectives found a brown wallet with the defendant's social security card and Alabama driver's license inside along with a driver's license belonging to Yates and identification cards belonging to Taolima Padron. Also inside the brown wallet was a receipt for a parking garage in downtown St. Louis, Missouri, time stamped at 11:08 a.m. on December 19, 2019. Next to the defendant's wallet on the nightstand was an iPhone plugged into a charger. Detectives also located more .45-caliber ammunition magazines in a nylon pouch attached to a black belt around the waistband of a pair of men's Levi's jeans. There were unknown dark red stains on the front of the jeans. Also recovered from the motel room were military style backpacks belonging to Diego and Taolima Padron, a wallet with Diego Padron's identification and bank cards, and a purse containing Taolima's bank card.

¶ 33 On December 20, 2019, a crime scene investigator (CSI) was tasked with processing the blue Ford Fusion belonging to Yates. Inside the Ford Fusion, CSI found McMillan's jeans with Diego's blood on them, a glove whose match appeared to be in the Padron's GMC Sierra, and the key fob to the Padrons' GMC Sierra.

¶ 34 The white GMC Sierra truck that belonged to the Padrons from Tennessee was found in the parking garage in downtown St. Louis, Missouri. While processing, CSI noted red, blood-like substances on the exterior and interior of the GMC pickup truck. Inside the truck was a black glove that appeared to be the mate to the glove found in the Fusion. Surveillance video from the parking garage later revealed that the Padrons' GMC pickup truck and Yates's Ford Fusion were driven

11

into the parking garage on December 19, 2019, at 11:08 a.m. The Ford Fusion left the parking garage at 11:18 a.m., but the truck did not follow.

¶ 35    Forensic scientists tested evidence collected at the scene for the presence of blood. Diego's DNA was found in several places: on McMillan's jeans, the stain on the glove, the interior and exterior of the truck, and the men's jeans.

¶ 36    At 12:55 p.m. on December 20, 2019, Detective Nick Manns interviewed the defendant at the Hazelwood Police Department. During the interview, the defendant described the gun found in the motel room and admitted the gun and ammunition were his. He further admitted the wallet containing Yates's identification was his, but he did not answer as to how her identification card came to be in his wallet. The defendant denied the cell phone was his.

¶ 37    After the State rested, the defendant filed a motion for a directed verdict. The trial court denied his motion, and the defendant rested. In closing, the defendant attempted to shift the blame to his codefendant McMillan. As to the charged murders, the defendant suggested that McMillan could have entered the Bethalto home and committed the murders.

¶ 38    The trial court then instructed the jury that evidence admitted for a limited purpose should not be considered for any other purpose. As to the offenses or conduct other than those charged in the indictment, the trial court gave the jury the limiting instruction that such evidence was received on the issues of the defendant's identification, intent, motive, or knowledge and may be considered for those limited purposes. The jury found the defendant guilty of armed robbery and three counts of first degree murder.

¶ 39    On February 11, 2022, the defendant filed a posttrial motion and motion for judgment of acquittal notwithstanding the jury's verdict. In the motion, the defendant argued, *inter alia*, there was insufficient evidence to prove whether he was present at the crime scene or that he participated

in the planning or commission of any crimes. Further, he asserted that the trial court erred in allowing evidence of the alleged other crimes, including evidence and testimony of pending criminal charges in Tennessee and Alabama. At the hearing, the State maintained that the court heard extensive arguments about the other-crimes evidence, properly weighed the factors, and properly limited the evidence that was admissible at trial.

¶ 40     In denying the defendant's posttrial motion, the trial court noted:

> "I would specifically like to mention there was other crimes evidence allowed in this case. We had extensive pretrial hearings regarding that evidence, and one of the issues that became clear to the Court and particularly during the trial was that—the way that these cases were interwoven to each other. Evidence from one case that was brought to this case. The incident in Alabama related to the incident in Tennessee, which related to the incident here. You couldn't possibly present the case in this, that happened here, without getting into what happened in Tennessee. Why are they driving a particular truck? Why are these people's identifications found in a wallet or in a car? It all became interwoven, and that became even more clear to the Court during the trial. So I allowed some of the other crimes evidenced [*sic*] in, and I kept out that other crimes evidenced [*sic*] that wasn't in the Court's eyes interwoven with what happened here."

¶ 41     Following a sentencing hearing, the trial court sentenced the defendant to three concurrent natural life terms for the three murders and a consecutive sentence of 30 years plus natural life for the armed robbery. The defendant filed a timely appeal.

¶ 42                                    II. ANALYSIS

¶ 43     The defendant's overarching claim of trial court error is that he was denied a fair trial where the State was allowed to present excessive and highly prejudicial other-crimes evidence of the defendant's alleged offenses in Alabama and Tennessee that occurred prior to the charged homicides that took place in Illinois. The State counters that the trial court properly admitted the other-crimes evidence as proof of the defendant's identity, intent, knowledge, and motive as well as part of a continuing narrative.

13

¶ 44    "The term 'other-crimes evidence' encompasses misconduct or criminal acts that occurred either before or after the allegedly criminal conduct for which the defendant is standing trial." *People v. Spyres*, 359 Ill. App. 3d 1108, 1112 (2005). The decision on whether to admit or exclude evidence must be made by the trial court responsible for evaluating the probative value of the evidence on a case-by-case basis, and a reviewing court may not substitute its judgment for that of the trial court on matters within the trial court's discretion. *People v. Illgen*, 145 Ill. 2d 353, 370-71 (1991). Thus, where reasonable minds could differ about the admissibility of the evidence, no abuse of discretion is found. *People v. Donoho*, 204 Ill. 2d 159, 186 (2003).

¶ 45    Generally, proof of other crimes not related to those alleged in the charging instrument cannot be introduced to show the defendant's propensity to commit crime. *People v. Hale*, 326 Ill. App. 3d 455, 462 (2001). However, an exception to the general rule is that other-crimes evidence is admissible where it is relevant to show intent, knowledge, identity, motive, absence of mistake, or *modus operandi* (Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)) or "if relevant to establish any material question other than the propensity to commit a crime" (*People v. Thingvold*, 145 Ill. 2d 441, 452 (1991)). "Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence in the case more probable or less probable than it would be without the evidence." *People v. Bedoya*, 325 Ill. App. 3d 926, 937 (2001). But even where other-crimes evidence is admissible for a permissible purpose, the evidence should be excluded "where the probative value of that evidence is substantially outweighed by the prejudicial effect on defendant's right to a fair trial." *People v. Robinson*, 167 Ill. 2d 53, 62-63 (1995).

¶ 46                                        A. Identity

¶ 47    The defendant argues that identity was not a contested issue. However, "[i]dentity is at issue whenever the defendant denies he was the offender." *People v. Boyd*, 366 Ill. App. 3d 84, 92

(2006). When relevant to show identity or bolster a victim's identification of the perpetrator, other-crimes evidence is admissible. *People v. Johnson*, 368 Ill. App. 3d 1146, 1158 (2006). Here, there were no living victims that could testify as to the identity of the perpetrator. Moreover, review of the record reveals that the defendant's theory of defense was that his codefendant had committed the three murders in Illinois. Thus, the other-crimes evidence was relevant to prove that the defendant, not the codefendant, was the individual who had killed Yates, Brooks, and McMillian. Without the other-crimes evidence, the State would have been unable to provide any theory as to the defendant's guilt.

¶ 48    At the close of trial, the trial court instructed the jury that the other-crimes evidence could be received on the issue of the defendant's identification. As a result, the jury was allowed to hear evidence that the police in Illinois were notified that a federal agent was investigating a home invasion and stolen vehicle out of Tennessee which led to the defendant and the codefendant being tracked by their cell phones to the motel in Missouri where they were later arrested. During the course of the investigation into the out-of-state crimes, parking lot surveillance video showed the defendant arriving at the motel in Yates's vehicle, which led investigators to request a welfare check to be done at the Yateses' Illinois residence where police ultimately discovered the three deceased victims. Thus, the other-crimes evidence was relevant to connect the defendant to the Illinois crime scene.

¶ 49    Although Yates's daughter had tied the codefendant to the Illinois crime scene when she testified that the codefendant had lived with Yates a few months prior to the murders, there were no witnesses that could tie the defendant to the Yates residence. That is where the other-crimes expert testimony became crucial because it established that the bullets recovered during the autopsies of the three Illinois victims were fired from the defendant's gun. The jury also was

15

allowed to hear testimony from the State's firearm expert that a .45-caliber shell casing recovered from the Padrons' Tennessee apartment and one recovered from the Illinois crime scene were both fired from the defendant's handgun. This was the same handgun that Graves identified at trial as the one that the defendant used to pistol-whip her face in Alabama.

¶ 50    Although the defendant maintains that the .45-caliber handgun recovered in the motel room was not relevant to prove identity, the gun was found in a motel room shared with the codefendant. Identity of the shooter went to the core of the defendant's theory at trial that it was his codefendant who had killed the victims. Review of the record reveals that witnesses were cross-examined about the codefendant's possession and use of a gun. In closing argument, in attempt to shift the blame to his codefendant, defense counsel suggested that the codefendant could have entered the Yateses' home and committed the murders without his involvement. Under the facts presented, we find no trial court error in admitting the other-crimes evidence on the issue of identification.

¶ 51                                    B. Motive

¶ 52    The defendant next argues that it was error for the trial court to admit the other-crimes evidence to prove motive. Contrary to the defendant's claim, other-crimes evidence is admissible to establish motive. *Johnson*, 368 Ill. App. 3d at 1157. Although the State is not required to prove motive, it is entitled to do so when evidence of motive exists. *Id.* Although the State need not prove beyond a reasonable doubt that the defendant committed an uncharged crime, the State's proof "must be more than a mere suspicion." *Thingvold*, 145 Ill. 2d at 456. "The motive exception to the general ban on other-crimes evidence arises in the context of other crimes that serve as the motive behind the crime charged." *People v. Lenley*, 345 Ill. App. 3d 399, 407 (2003).

¶ 53    The trial court allowed the State to present other-crimes evidence in support of its theory that the motive for the Illinois murders was that the defendant and the codefendant needed a

16

different vehicle in their attempt to elude the police in the commission of their multi-state crime spree. On the day of the murders, video surveillance showed a white truck driving towards the Yates residence which matched the description of the Padrons' GMC Sierra truck stolen from Tennessee the previous day. The evidence of the stolen truck from Tennessee was relevant to tie the defendant to the Illinois murders because the police found a receipt in the defendant's wallet for the parking garage in downtown St. Louis, Missouri, where the Padrons' stolen truck was later recovered. Furthermore, the parking garage surveillance video showed that both the Padrons' truck and Yates's Ford Fusion were driven into the parking garage on the morning of the murders, but only Yates's vehicle left the parking garage that day. Yates's vehicle, now sporting a Wisconsin license plate, and the key fob to the Padron's truck were later discovered at the hotel where the defendant was arrested. Accordingly, the defendant's claim of error on this issue is without merit.

¶ 54                  C. Probative Value Verses Prejudicial Effect

¶ 55    The defendant next argues that at various stages, the trial court gave different reasons for allowing the State to present other-crimes evidence to the jury. The defendant argues that prior to trial, the trial court ruled that the State would be allowed to present to the jury some of the evidence from Alabama and all of the evidence from Tennessee because the evidence was relevant to show identification, motive, and common scheme.[1] During trial, the trial court gave a limiting instruction to the jury that the other-crimes evidence was to be received on the issues of the defendant's intent, motive, or knowledge. Finally, at the close of evidence, the trial court gave the jury the limiting

---

[1]We note that prior to trial, the trial court's ruling on the State's motion to admit other bad acts was broader than claimed by the defendant where the trial court found that the other-crimes evidence would be allowed "for all the reasons that the State has alleged," which included motive, intent, identity, continuing narrative, and common scheme or design.

instruction that the other-crimes evidence was to be received on the issues of the defendant's identification, intent, motive, or knowledge.

¶ 56    The State counters that the defendant forfeited review of this issue where he did not object at trial, nor did he offer an alternative instruction, or challenge the instruction in his posttrial motion (see *People v. Herron*, 215 Ill. 2d 167, 175 (2005)). The defendant concedes that the issue regarding the jury instruction discrepancy was not preserved; however, he maintains that his true claim of error is that the trial court's inconsistent reasons for allowing the other-crimes evidence to be admitted refutes the possibility that the trial court carefully analyzed the probative value of the other-crimes evidence before finding it admissible. Accordingly, we turn our attention to the defendant's claim that the trial court erred in allowing other-crimes evidence where the probative value was outweighed by its prejudicial effect.

¶ 57    "Whether the probative value of other-crimes evidence is outweighed by its prejudicial impact is a determination left to the trial court's discretion, and we will not disturb that decision absent a clear abuse of discretion." *Spyres*, 359 Ill. App. 3d at 1114. The trial court is in the best position to weigh the prejudicial impact of the other-crimes evidence versus its probative value in the context of the entire case. *Id.* at 1114-15.

¶ 58    Here, the defendant was charged with first degree murder. The primary issue at trial was whether it was the defendant who shot the victims. There is no doubt that the other-crimes evidence presented to the jury was prejudicial to the defendant, but the trial court was required to determine whether its prejudicial impact outweighed its probative value. We find that the trial court carefully analyzed the probative value of the other-crimes evidence, and it specifically considered the risk of unfair prejudice. Regarding the torture and murder of Hughes in Alabama, the trial court found that the prejudicial effect outweighed the probative value and, therefore, did not allow the State to

18

present this evidence to the jury. Nor did the trial court allow testimony regarding the existence of the defendant's alleged criminal enterprise in Alabama. Reviewing the trial court's decision under the appropriate standard, we conclude that the trial court did not abuse its discretion in determining that the probative value of the other-crimes evidence outweighed its prejudicial effect.

¶ 59                                     C. Mini-Trials

¶ 60    The defendant contends that the trial court erred by permitting the State to conduct two separate mini-trials regarding the other-crimes evidence. Not only did the jury hear other-crimes testimony from Graves and the Padrons, they also saw other-crimes photographic evidence that was admitted at trial. The defendant complains that the jury also heard testimony from the State's DNA expert and the State's firearm expert. The defendant asserts that of the 386 State's exhibits admitted into evidence, 279 were relevant to the Bethalto homicides, 2 were relevant only to the Alabama offenses, and 105 were relevant only to the Tennessee offenses.

¶ 61    Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011); *Illgen*, 145 Ill. 2d 353. However, a trial court must carefully limit the details of the other-crimes evidence to what is necessary to illuminate the issue for which the other crime was introduced. *People v. Aleman*, 313 Ill. App. 3d 51, 65 (2000); *Boyd*, 366 Ill. App. 3d at 94. The admission of other-crimes evidence should not lead to mini-trials on uncharged offenses. *Boyd*, 366 Ill. App. 3d at 94.

¶ 62    In the case at bar, although a large amount of other-crimes evidence was presented, we find that the trial court carefully limited it to what was necessary to clarify the issues for which it was introduced; namely, that it was the defendant who had killed the three victims. The other-crimes testimony was relevant to connect the evidence found at the Illinois crime scene to the defendant.

19

The evidence concerning the home invasion in Tennessee was relevant to specifically connect the defendant to the gun that was used in the Illinois murders and to explain whose blood was found at the end of the barrel since it did not belong to the victims. Without it, the police in Illinois would have had no reason to conduct a wellness check at the Yates residence in Bethalto where the victims' bodies were found. After carefully examining the record, and in considering all of the evidence, we find the defendant's contention to be without merit.

¶ 63                                III. CONCLUSION

¶ 64    For the foregoing reasons, we affirm the trial court's judgment.


¶ 65    Affirmed.